[No. D054743. Fourth Dist., Div. One. Aug. 18, 2009.]

THE PEOPLE, Plaintiff and Appellant, v.
STACY ROBERT HOCHANADEL et al., Defendants and Respondents.

## COUNSEL

Rod Pacheco, District Attorney, and Jacqueline C. Jackson, Deputy District Attorney, for Plaintiff and Appellant.

Marylou Hillberg, under appointment by the Court of Appeal, for Defendant and Respondent Stacy Robert Hochanadel.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Respondent John Reynold Bednar.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Respondent James Thomas Campbell.

## OPINION

**NARES, J.**—In this case we are presented with two questions regarding the legality of storefront dispensaries that provide medical marijuana pursuant to the Compassionate Use Act of 1996 (CUA; Health & Saf. Code, § 11362.5), approved by voters in 1996 under Proposition 215, and its implementing legislation, the Medical Marijuana Program Act (MMPA).

First, did the MMPA unconstitutionally amend the CUA when it authorized "cooperatives" and "collectives" to cultivate and distribute medical marijuana?

Second, did the court err in quashing a search warrant for a storefront medical marijuana dispensary called CannaHelp located in the City of Palm Desert, California, and dismissing the criminal charges against defendants Stacy Robert Hochanadel, James Thomas Campbell and John Reynold Bednar (collectively, defendants), who operated CannaHelp, based on its findings that (1) CannaHelp was a legal "primary caregiver" under the CUA and MMPA; and (2) the detective who authored the search warrant affidavit was not qualified to opine as to the legality of CannaHelp?

We conclude the MMPA's authorization of cooperatives and collectives did not amend the CUA, but rather was a distinct statutory scheme intended to facilitate the transfer of medical marijuana to qualified medical marijuana patients under the CUA that the CUA did not specifically authorize or prohibit. We also conclude that storefront dispensaries that qualify as "cooperatives" or "collectives" under the CUA and MMPA, and otherwise comply with those laws, may operate legally, and defendants may have a defense at trial to the charges in this case based upon the CUA and MMPA. We further

conclude, however, that the court erred in finding that CannaHelp qualified as a primary caregiver under the CUA and MMPA and in finding that the detective who authored the search warrant affidavit was not qualified to opine as to the legality of CannaHelp's activities. We conclude the facts stated in the search warrant affidavit provided probable cause defendants were engaged in criminal activity, and, even if the search warrant lacked probable cause, the author of the search warrant affidavit acted in reasonable reliance on its validity. Accordingly, the court erred in quashing the search warrant and dismissing the charges against defendants. Finally, we conclude that, contrary to the People's contention, defendants Campbell and Bednar had standing to challenge the validity of the search warrant.

## INTRODUCTION

Based upon evidence obtained from a search pursuant to a court-authorized warrant, the Riverside County District Attorney's Office charged defendants with possession of marijuana for sale (Health & Saf. Code,[1] § 11359; count 1); transportation of marijuana (§ 11360, subd. (a); count 2); and maintaining a business for the purpose of selling marijuana (§ 11366; count 3).

Defendants brought a motion to quash the search warrant. The court granted the motion finding (1) the detective who authored the affidavit in support of the search warrant was not qualified as an expert on the CUA and MMPA; (2) the dispensary defendants operated qualified as a "primary caregiver" under the CUA and thus they did not violate the law; and (3) the warrant and resulting evidence were therefore illegal. The court thereafter dismissed the case based upon a lack of evidence.

The People appeal, asserting the court erred in quashing the search warrant because (1) the MMPA, which implemented the CUA, unconstitutionally amended the CUA by authorizing marijuana cooperatives as primary caregivers; (2) defendants' storefront dispensary did not qualify as a primary caregiver under the MMPA; (3) the "collective knowledge" doctrine established probable cause for the warrant; (4) the detective who authored the search warrant provided competent expert evidence to support a finding of probable cause; (5) the good faith exception to the exclusionary rules applies even if the search warrant was invalid; and (6) defendants Bednar and Campbell did not have standing to challenge the search warrant as they were not owners of CannaHelp.

---

[1] All further statutory references are to the Health and Safety Code unless otherwise specified.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *The Investigation*

In October 2005 Hochanadel opened a marijuana dispensary named "Hempies" in the City of Palm Desert. Hochanadel later changed the name to "CannaHelp." Hochanadel filed a certificate of use statement with the State of California, identifying it as a dispensary for medical marijuana. CannaHelp obtained a business license from the City of Palm Desert to operate a medical marijuana dispensary and operated it in a transparent fashion. Access to the business was controlled by employees, who allowed customers to enter a room where their medical marijuana prescription was verified. Once it was verified the customer had a valid prescription, the customer was allowed access to a second room where various types of marijuana were on display. Employees received weekly training on the different strains of marijuana and offered advice to patients on what strains were effective for different ailments. Prior to making a purchase, customers completed paperwork designating CannaHelp as their primary caregiver. All the patients of CannaHelp had valid doctor's statements, and CannaHelp contacted authorities when someone tried to illegally purchase marijuana. CannaHelp operated like any other business, with financial records, employee records, and policies and procedures. Campbell and Bednar were the managers and co-owners of CannaHelp. All three defendants had medical referrals for marijuana and were qualified medical marijuana patients under the CUA.

Riverside County Sheriff's Detective Robert Garcia investigated CannaHelp. Under his direction, police conducted surveillance of CannaHelp. They observed a significant amount of buying activity. The customers were mostly young, without any observable health conditions. Detective Garcia saw Gary and Krista Silva arrive in a van. It was determined Gary Silva was a manufacturer and supplier of marijuana to CannaHelp.

On March 14, 2006, federal agents executed a search warrant at Gary Silva's home. While executing the search warrant, officers observed a fully operational growing operation in a sectioned-off portion of the garage, with 69 marijuana plants and growing equipment. Agents found "numerous" loaded firearms in Silva's residence. They also discovered several canisters of dried marijuana for sale, and marijuana on drying racks in the master bedroom.

Detective Garcia sent an undercover officer into CannaHelp with a manufactured physician's statement produced by the sheriff's department. That

---

[2] Because this matter was dismissed prior to trial, we take the facts from the preliminary hearing transcript and the search warrant affidavit.

officer was denied entry when CannaHelp employees could not verify the physician's statement was legitimate.

A second officer then went to a physician in Los Angeles and complained of chronic back pain. He obtained a statement from that doctor allowing him to purchase medical marijuana. He presented it to CannaHelp and was allowed to purchase marijuana. Prior to purchasing the marijuana, he was given advice as to which strain would be most helpful for his back pain and signed a document designating CannaHelp as his primary caregiver.

While inside CannaHelp, the undercover agent observed an ATM machine and three display boards listing prices for different quantities of marijuana. The agent also observed plastic containers of marijuana inside a glass counter. An employee recommended a specific type of marijuana for his back pain, and he purchased one ounce of marijuana for $290. The same agent later conducted another undercover buy, this time purchasing one-half an ounce for $290.

B. *Search Warrant Affidavit*

Detective Garcia executed an affidavit in support of a search warrant for Hochanadel's residences and CannaHelp. Detective Garcia related his experience in narcotics investigations, noting that he was assigned to the Special Investigations Bureau charged with narcotics investigations. He stated that during his employment with the Riverside County Sheriff's Department he "participated in several narcotics training and education courses dealing with the sales, packaging, recognition, preparation, paraphernalia, and use of narcotics, dangerous drugs and controlled substances. This training also included instruction of the types of financial records maintained by person(s) who traffic in controlled substances." He also "received approximately 20 hours of instruction on narcotics, dangerous drugs, and controlled substances" while attending the sheriff's academy. He attended an undercover operations course and a criminal interdiction course. He also detailed his experience in narcotics arrests and search warrants, as well as investigations of marijuana grow operations.

The affidavit then detailed the investigation of CannaHelp, discussed *ante.* Based upon that investigation, Detective Garcia concluded that CannaHelp was operating illegally because it was "selling marijuana, which is a violation of [sections] 11359 and 11360. In California, there is no authority for the existence of storefront marijuana businesses. The [MMPA] allows patients and primary caregivers to grow and cultivate marijuana, no one else. A primary caregiver is defined as an 'individual' who has consistently assumed responsibility for the housing, health or safety of a patient. A storefront

marijuana business cannot, under the law, be a primary caregiver." Detective Garcia further opined CannaHelp was operating illegally because it was a for-profit enterprise: "Additionally, given this is a 'cash only' business, the presence of an ATM machine, high prices charged for small amounts of marijuana, it is also my opinion that this criminal enterprise is 'for profit' which is outside of any of the guidelines in the medical marijuana exceptions." Specifically, Detective Garcia opined the price for marijuana at CannaHelp was approximately twice the price of "mid-grade" marijuana available on the streets.

Based upon Detective Garcia's affidavit, the court granted the search warrant.

### C. *Detective Garcia's Preliminary Hearing Testimony*

At the preliminary hearing, Detective Garcia admitted he had no formal training in medical marijuana laws. He was "[j]ust given a pamphlet or some paperwork, just given the laws just to read over."

He further admitted that based upon his review of CannaHelp's financial records, it was losing money, with annual revenues of $1.7 million, and expenses of $2.6 million, not including rent, utilities or other expenses. He admitted the business was "upside down."

### D. *Motion to Quash*

Defendants brought motions to quash the search warrant. Defendants argued (1) CannaHelp qualified as a primary caregiver under the CUA and MMPA, and therefore the motion should be quashed based upon a lack of probable cause; and (2) the search warrant was invalid as Detective Garcia was not qualified to execute it.

After reading the affidavit in support of the search warrant, the transcript of the preliminary hearing, and the pleadings in the file, the court granted defendants' motion to quash. The court first determined Detective Garcia was not qualified to author the search warrant as he had no training or understanding of medical marijuana laws. The court further found CannaHelp was a valid primary caregiver. In doing so, the court first noted Detective Garcia was incorrect in his conclusion it was operating at a profit. The court also noted CannaHelp operated in the open, in compliance with city and state regulations, and only sold to persons holding legitimate medical marijuana cards. Based upon these facts, the court found CannaHelp was a "legal primary caregiver" and was in compliance with the medical marijuana laws.

The court thus found there was no probable cause for a search warrant and granted the motion to quash. The court thereafter dismissed the case based upon a lack of evidence.

### DISCUSSION

### I. *APPLICABLE AUTHORITY*

#### A. *The CUA*

The CUA was approved by California voters as Proposition 215 in 1996 and is codified at section 11362.5. (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1546 [66 Cal.Rptr.2d 559]; *People v. Tilehkooh* (2003) 113 Cal.App.4th 1433, 1436 [7 Cal.Rptr.3d 226].) Subdivision (d) of section 11362.5 provides: "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." The CUA directed the Legislature to "implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." (§ 11362.5, subd. (b)(1)(C).)

Under the CUA, a "primary caregiver" is defined as "the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person." (§ 11362.5, subd. (e).) The California Supreme Court has recently held that to be a primary caregiver under this section, an individual must show that "he or she (1) consistently provided caregiving, (2) independent of any assistance in taking medical marijuana, (3) at or before the time he or she assumed responsibility for assisting with medical marijuana." (*People v. Mentch* (2008) 45 Cal.4th 274, 283 [85 Cal.Rptr.3d 480, 195 P.3d 1061] (*Mentch*).) The high court in *Mentch* concluded that a person does not qualify as a primary caregiver merely by having a patient designate him or her as such or by the provision of medical marijuana itself. (*Id.* at pp. 283–285.) Rather, the person must show "a caretaking relationship directed at the core survival needs of a seriously ill patient, not just one single pharmaceutical need." (*Id.* at p. 286.)

#### B. *The MMPA*

In 2003 the Legislature enacted the MMPA, effective January 1, 2004, adding sections 11362.5 through 11362.83 to the Health and Safety Code. (*People v. Wright* (2006) 40 Cal.4th 81, 93 [51 Cal.Rptr.3d 80, 146 P.3d 531].) The express intent of the Legislature was to: "(1) Clarify the scope of

the application of the [CUA] and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law enforcement officers. [¶] (2) Promote uniform and consistent application of the [CUA] among the counties within the state. [¶] (3) Enhance the access of patients and caregivers to medical marijuana through *collective, cooperative cultivation projects.* [¶] (c) It is also the intent of the Legislature to address additional issues that were not included within the [CUA], and that must be resolved in order to promote the fair and orderly implementation of the [CUA]." (Stats. 2003, ch. 875, § 1, italics added.) The legislative history further states, *"Nothing in [the MMPA] shall amend or change Proposition 215, nor prevent patients from providing a defense under Proposition 215 . . . . The limits set forth in [the MMPA] only serve to provide immunity from arrest for patients taking part in the voluntary ID card program, they do not change Section 11362.5 (Proposition 215) . . . ."* (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 420 (2003–2004 Reg. Sess.) as amended Sept. 9, 2003, pp. 6–7, italics added.)

Of relevance to this appeal, the MMPA added section 11362.775, which provides: "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357 [possession of marijuana], 11358 [cultivation of marijuana], 11359 [possession for sale], 11360 [transportation], 11366 [maintaining a place for the sale, giving away or use of marijuana], 11366.5 [making available premises for the manufacture, storage or distribution of controlled substances], or 11570 [abatement of nuisance created by premises used for manufacture, storage or distribution of controlled substance]."

The Court of Appeal in *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 785 [33 Cal.Rptr.3d 859] (*Urziceanu*) noted that "[t]his new law represents a dramatic change in the prohibitions on the use, distribution, and cultivation of marijuana for persons who are qualified patients or primary caregivers . . . . Its specific itemization of the marijuana sales law indicates it contemplates the formation and operation of medicinal marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that marijuana."

The MMPA also elaborates on the definition of primary caregiver in the CUA. It first retains the definition of a primary caregiver contained in the CUA: "the individual, designated by a qualified patient . . . who has consistently assumed responsibility for the housing, health, or safety of that

patient or person . . . ." (§ 11362.7, subd. (d).) The subdivision goes on to provide three examples of persons who would qualify as primary caregivers under this definition: (1) Owners and operators of clinics or care facilities; (2) "An individual who has been designated as a primary caregiver by more than one qualified patient or person with an identification card, if every qualified patient or person with an identification card who has designated that individual as a primary caregiver resides in the same city or county as the primary caregiver"; and (3) "An individual who has been designated as a primary caregiver by a qualified patient or person with an identification card who resides in a city or county other than that of the primary caregiver, if the individual has not been designated as a primary caregiver by any other qualified patient or person with an identification card." (§ 11362.7, subd. (d)(1)–(3).)

■ The MMPA also specifies that collectives, cooperatives or other groups shall not profit from the sale of marijuana. (§ 11362.765, subd. (a) ["nothing in this section shall authorize . . . any . . . group to cultivate or distribute marijuana for profit"].)

### C. *Attorney General Guidelines*

Section 11362.81, subdivision (d) provides: "[T]he Attorney General shall develop and adopt appropriate guidelines to ensure the security and nondiversion of marijuana grown for medical use by patients qualified under the [CUA]."

On August 25, 2008, the California Attorney General issued "Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use" (A.G. Guidelines) <http://ag.ca.gov/cms_attachments/press/pdfs/n1601_medicalmarijuanaguidelines.pdf> (as of Aug. 18, 2009). The A.G. Guidelines' stated purpose is to "(1) ensure that marijuana grown for medical purposes remains secure and does not find its way to non-patients or illicit markets, (2) help law enforcement agencies perform their duties effectively and in accordance with California law, and (3) help patients and primary caregivers understand how they may cultivate, transport, possess, and use medical marijuana under California law." (*Id.* at p. 1.)

Several of the guidelines are helpful to our analysis. First, the A.G. Guidelines reiterate the "consistency" element of the definition of primary caregiver contained in both the CUA and MMPA: "Although a 'primary caregiver who consistently grows and supplies . . . medicinal marijuana for a section 11362.5 patient is serving a health need of the patient,' someone who merely maintains a source of marijuana does not automatically become the

party 'who has consistently assumed responsibility for the housing, health, or safety' of that purchaser." (A.G. Guidelines, *supra*, at p. 4.)

Further, the A.G. Guidelines provide a definition of "cooperatives" and "collectives." A cooperative "must file articles of incorporation with the state and conduct its business for the mutual benefit of its members. [Citation.] No business may call itself a 'cooperative' (or 'co-op') unless it is properly organized and registered as such a corporation under the Corporations or Food and Agriculture Code. [Citation.] Cooperative corporations are 'democratically controlled and are not organized to make a profit for themselves, as such, or for their members, as such, but primarily for their members as patrons.' [Citation.]" (A.G. Guidelines, *supra*, at p. 8.) Further, "[c]ooperatives must follow strict rules on organization, articles, elections, and distribution of earnings, and must report individual transactions from individual members each year." (*Ibid.*)

A collective is " 'a business, farm, etc., jointly owned and operated by the members of a group.' [Citation.]" (A.G. Guidelines, *supra*, at p. 8.) Thus, "a collective should be an organization that merely facilitates the collaborative efforts of patient and caregiver members—including the allocation of costs and revenues." (*Ibid.*) Further, the A.G. Guidelines opine, "The collective should not purchase marijuana from, or sell to, non-members; instead, it should only provide a means for facilitating or coordinating transactions between members." (*Ibid.*)

The A.G. Guidelines further provide guidelines for the lawful operation of cooperatives and collectives. They must be nonprofit operations. (A.G. Guidelines, *supra*, at p. 9.) They may "acquire marijuana only from their constituent members, because only marijuana grown by a qualified patient or his or her primary caregiver may lawfully be transported by, or distributed to, other members of a collective or cooperative . . . . *Nothing allows marijuana to be purchased from outside the collective or cooperative for distribution to its members.* Instead, the cycle should be a closed-circuit of marijuana cultivation and consumption with no purchases or sales to or from non-members. To help prevent diversion of medical marijuana to non-medical markets, collectives and cooperatives should document each member's contribution of labor, resources, or money to the enterprise. They should also track and record the source of their marijuana." (*Id.* at p. 10, italics added.)

Distribution and sales to nonmembers is prohibited: "State law allows primary caregivers to be reimbursed for certain services (including marijuana cultivation), but nothing allows individuals or groups to sell or distribute marijuana to non-members. Accordingly, a collective or cooperative may not distribute medical marijuana to any person who is not a member in good

standing of the organization. A dispensing collective or cooperative may credit its members for marijuana they provide to the collective, which it may then allocate to other members. [Citation.] Members also may reimburse the collective or cooperative for marijuana that has been allocated to them. Any monetary reimbursement that members provide to the collective or cooperative should only be an amount necessary to cover overhead costs and operating expenses." (A.G. Guidelines, *supra*, at p. 10.)

Finally, the A.G. Guidelines provide guidance to law enforcement as to whether activities comply with the CUA and MMPA. In this regard, the guidelines specifically address "Storefront Dispensaries." (A.G. Guidelines, *supra*, at p. 11, boldface omitted.) The Attorney General is of the opinion that while "dispensaries, as such, are not recognized under the law," "a properly organized and operated collective or cooperative that dispenses medical marijuana through a storefront may be lawful under California law, but . . . dispensaries that do not substantially comply with the guidelines [covering collectives and cooperatives] are likely operating outside the protections of [the CUA] and the MMP[A], and . . . the individuals operating such entities may be subject to arrest and criminal prosecution under California law. *For example, dispensaries that merely require patients to complete a form summarily designating the business owner as their primary caregiver—and then offering marijuana in exchange for cash 'donations'—are likely unlawful.*" (A.G. Guidelines, *supra*, at p. 11, italics added.)

"While the Attorney General's views do not bind us [citation], they are entitled to considerable weight [citation]." (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 829 [25 Cal.Rptr.2d 148, 863 P.2d 218].)

## II. *CONSTITUTIONAL CHALLENGE*

The People assert that section 11362.775, which exempts medical marijuana patients, persons with valid medical marijuana identification cards and their primary caregivers who form collectives or cooperatives to cultivate marijuana from prosecution for several drug-related crimes, constituted an unconstitutional amendment of the CUA. This contention is unavailing.

Article II, section 10, subdivision (c) of the California Constitution prohibits the Legislature from amending an initiative measure unless the initiative measure itself authorizes legislative amendment. (Cal. Const., art. II, § 10, subd. (c); *People v. Cooper* (2002) 27 Cal.4th 38, 44 [115 Cal.Rptr.2d 219, 37 P.3d 403].) Here, it is undisputed the CUA does not allow legislative amendments to its provisions. Thus, if the MMPA in any manner amended

the CUA, the amendment would be unconstitutional. (*Cooper, supra,* 27 Cal.4th at p. 44.) However, as we shall explain, section 11362.775 does not amend the CUA.

■ "An amendment is '. . . any change of the scope or effect of an existing statute, whether by addition, omission, or substitution of provisions, which does not wholly terminate its existence, whether by an act purporting to amend, repeal, revise, or supplement, or by an act independent and original in form . . . [.]' [Citation.] A statute which adds to or takes away from an existing statute is considered an amendment." (*Franchise Tax Board v. Cory* (1978) 80 Cal.App.3d 772, 776 [145 Cal.Rptr. 819]; see *Knight v. Superior Court* (2005) 128 Cal.App.4th 14, 22 [26 Cal.Rptr.3d 687].)

As we recently stated in *County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 829–830 [81 Cal.Rptr.3d 461] (*County of San Diego*), "[t]he proscription embodied in article II, section 10, subdivision (c) of the California Constitution is designed to ' "protect the people's initiative powers by precluding the Legislature from undoing what the people have done, without the electorate's consent." ' [Citation.] '[L]egislative enactments related to the subject of an initiative statute may be allowed' when they involve a 'related but distinct area' [citation] or relate to a subject of the initiative that the initiative 'does not specifically authorize or prohibit.' [Citation.]"

In *County of San Diego*, San Diego and San Bernardino Counties (together, the Counties) contested the MMPA's requirement that they implement and administer the identification card system related to qualified patients and primary caregivers. (*County of San Diego, supra,* 165 Cal.App.4th at p. 808.) Among other things, the Counties asserted the MMPA's mandate requiring implementation of an identification card system was an unconstitutional amendment to the CUA. (165 Cal.App.4th at p. 829.) This court held that the MMPA did not amend the CUA. In doing so, we reasoned that the MMPA did not add to the CUA as it was a separate legislative scheme, CUA protections remained intact, and the identification card system did not impact the CUA's protections: "The MMP[A]'s identification card system, by specifying participation in that system is voluntary and a person may 'claim the protections of [the CUA]' without possessing a card [citation], demonstrates the MMP[A]'s identification card system is a discrete set of laws designed to confer distinct protections under California law that the CUA does *not* provide without limiting the protections the CUA *does* provide. For example, unlike the CUA, which did not immunize medical marijuana users from arrest but instead provided a limited 'immunity' defense to prosecution under state law for cultivation or possession of marijuana [citation], the MMP[A]'s identification card system is designed to protect against unnecessary arrest. [Citation.] Additionally, the MMP[A] exempts the bearer of an identification card (as

well as qualified patients as defined by the MMP[A]) from liability for other controlled substance offenses not expressly made available to medical marijuana users under the CUA." (*County of San Diego, supra,* 165 Cal.App.4th at p. 830.)

As we further held, "Here, although the legislation that enacted the MMP[A] added statutes regarding California's treatment of those who use medical marijuana or who aid such users, it did not add statutes or standards *to the CUA.* Instead, the MMP[A]'s identification card is a part of a separate legislative scheme providing separate protections for persons engaged in the medical marijuana programs, and the MMP[A] carefully declared that the protections provided by the CUA were preserved without the necessity of complying with the identification card provisions. [Citation.] The MMP[A], in effect, amended provisions of the Health and Safety Code regarding regulation of drugs adopted by the Legislature, not provisions of the CUA. Because the MMP[A]'s identification card program has no impact on the protections provided by the CUA, we reject Counties' claim that those provisions are invalidated by article II, section 10, subdivision (c), of the California Constitution." (*County of San Diego, supra,* 165 Cal.App.4th at p. 831.)[3]

As with the identification card provisions of the MMPA addressed in *County of San Diego,* section 11362.775, relating to cooperatives and collectives, did not constitute an amendment of the CUA as it was not intended to, and did not, alter the rights provided by the CUA. Rather, it identifies groups that may lawfully distribute medical marijuana to patients under the CUA. Thus, it was designed to *implement,* not amend the CUA. Like the identification card provisions, the defense against arrest and prosecution given to qualified individuals who establish cooperatives and collectives to deliver medical marijuana under the CUA "amended provisions of the Health and Safety Code regarding regulation of drugs adopted by the Legislature, not provisions of the CUA. Because the MMP[A]'s [cooperative and collective] program has no impact on the protections provided by the CUA, we reject [the People's] claim that those provisions are invalidated by article II, section 10, subdivision (c), of the California Constitution." (*County of San Diego, supra,* 165 Cal.App.4th at p. 831.)

---

[3] The California Supreme Court has recently granted review in two cases that held section 11362.77 of the MMPA, which limits the amount of marijuana a qualified patient may legally possess, unconstitutionally amended the CUA because the CUA only stated that qualified patients could possess a "reasonable" amount consistent with a patient's needs. (See *People v. Phomphakdy* (July 31, 2008, C056881), review granted Oct. 28, 2008, S166565; *People v. Kelly* (May 22, 2008, B195624), review granted Aug. 13, 2008, S164830.) That issue is not before us on this appeal.

Indeed, the CUA itself directed the state to create a statutory plan to provide for the safe and affordable distribution of medical marijuana to qualified patients. (§ 11362.5, subd. (b)(1)(C).) Thus, in enacting section 11362.775 the Legislature created what the CUA expressly contemplated and did not unconstitutionally amend the CUA.

## III. *MOTION TO QUASH*

The People assert the court erred in granting the motion to quash the search warrant, and in suppressing the evidence seized pursuant thereto, because (1) CannaHelp did not qualify as a primary caregiver under the CUA; (2) it was not a collective or cooperative under the CUA; (3) the collective knowledge doctrine rendered Detective Garcia qualified to author the search warrant affidavit; (4) the good faith exception to the exclusionary rule applied; and (5) defendants Bednar and Campbell lacked standing to contest the search warrant as they were only employees of CannaHelp.

We conclude that the court erred in finding that CannaHelp qualified as a primary caregiver under the CUA and MMPA and in finding that Detective Garcia was not qualified to author the search warrant affidavit. We further conclude that while those who operate storefront dispensaries that qualify as true cooperatives or collectives may be immune from prosecution for the offenses listed in section 11362.775, and defendants may have a defense at trial to the charges in this case based upon that section of the MMPA, the facts stated in Detective Garcia's search warrant affidavit provided probable cause defendants were engaged in criminal activity. Moreover, to the extent the search warrant lacked probable cause, the officers executing the search warrant acted in reasonable reliance on its validity. Accordingly, the court erred in quashing the search warrant and dismissing the charges against defendants.

### A. *Probable Cause Necessary for Search Warrants*

■ "The Fourth Amendment provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation . . . .' California Constitution, article I, section 13, and Penal Code section 813 contain similar provisions. An arrest warrant which is not supported by a showing of probable cause must fail, and an arrest made pursuant to it is illegal." (*People v. Campa* (1984) 36 Cal.3d 870, 879 [206 Cal.Rptr. 114, 686 P.2d 634].) "In determining the sufficiency of an affidavit for the issuance of a . . . warrant the test of probable cause is approximately the same as that applicable to an arrest without a warrant . . . namely, whether the facts contained in the affidavit are such as would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion of the guilt of

the accused." (*Skelton v. Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485].) Stated another way, the issuing magistrate's task is to make a practical and commonsense determination whether, given all the information in the affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 103 S.Ct. 2317].)

■ However, "[e]vidence seized pursuant to a warrant unsupported by probable cause need not necessarily be excluded. The Fourth Amendment exclusionary rule does not bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. [Citations.]" (*People v. Lim* (2000) 85 Cal.App.4th 1289, 1296 [102 Cal.Rptr.2d 604].) In *United States v. Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405], the Supreme Court concluded "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." (*Id.* at p. 922.) Accordingly, the court held the exclusionary rule should not be applied when the officer conducting a search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate, which warrant is subsequently determined to be invalid. (*Id.* at pp. 922–923.) In considering that question, we apply the objective test of "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." (*Id.* at p. 922, fn. 23.) Moreover, "the objective reasonableness of an officer's decision to apply for a warrant must be judged based on the affidavit and the evidence of probable cause contained therein and known to the officer, 'and without consideration of the fact that the magistrate accepted the affidavit.' [Citation.]" (*People v. Camarella* (1991) 54 Cal.3d 592, 605 [286 Cal.Rptr. 780, 818 P.2d 63], fn. omitted.)

Finally, we resolve doubtful or marginal cases in favor of upholding the search warrant as it is the duty of a reviewing court "to save the warrant if it can in good conscience do so . . . ." (*Caligari v. Superior Court* (1979) 98 Cal.App.3d 725, 729–730 [159 Cal.Rptr. 534].)

## B. *CannaHelp and Its Operators Are Not Primary Caregivers*

■ As discussed, *ante*, even after the enactment of the MMPA, a primary caregiver is required to be someone who (1) has been designated as such by one exempted under the CUA and MMPA; and (2) "has consistently assumed responsibility for the housing, health, or safety of that patient or person." (§ 11362.7, subd. (d); see *Mentch, supra,* 45 Cal.4th at p. 283; A.G. Guidelines, *supra,* at p. 4.) While the MMPA identifies certain individuals

who can be valid primary caregivers, i.e., persons designated by more than one person, all of whom reside in the same city or county, the person (or entity) must still meet the requirement of "consistently" assuming responsibility for the housing, health or safety of that person. (§ 11362.7, subd. (d); see *Mentch, supra,* at p. 283; A.G. Guidelines, *supra,* at p. 4.) As our high court recently explained, this entails an "existing, established relationship," distinct from the provision of medical marijuana itself. (*Mentch, supra,* at pp. 283–284.) Individuals operating a marijuana-buying cooperative do not, by providing medical patients with medicinal marijuana, consistently assume responsibility for the health of those patients. (*People ex rel. Lungren v. Peron* (1997) 59 Cal.App.4th 1383, 1390 [70 Cal.Rptr.2d 20]; *Mentch, supra,* 45 Cal.4th at p. 284 [citing *People ex rel. Lungren v. Peron* with approval].)

■ Thus, a storefront dispensary and its operators do not qualify as primary caregivers simply because a qualified medical marijuana patient has so designated them. Moreover, the provision of medical marijuana, even if done on a "consistent" basis, does not make one a "primary caregiver." There must be evidence of an existing, established relationship, providing for housing, health or safety "independent of the administration of medical marijuana." (*Mentch, supra,* 45 Cal.4th at p. 284.) There is no evidence CannaHelp or defendants had such a relationship with the customers who purchased medical marijuana from them. A storefront dispensary that merely provides walk-in customers with medical marijuana does not possess the type of "consistent" relationship necessary to achieve primary caregiver status. Accordingly, the court erred in finding CannaHelp qualified as a primary caregiver under the CUA and MMPA.

However, that conclusion does not end our inquiry, as we must analyze whether other facts show there was probable cause to issue the search warrant. Specifically, we must examine (1) whether the facts showed defendants were operating CannaHelp as a cooperative or collective; (2) whether the "good faith" exception to the exclusionary rule applies; and (3) whether Detective Garcia was qualified to author the search warrant.

### C. *CannaHelp as Cooperative or Collective*

■ As noted, *ante,* in enacting section 11362.775, the Legislature "exempted those qualifying patients and primary caregivers who collectively or cooperatively cultivate marijuana for medical purposes from criminal sanctions for possession for sale, transportation or furnishing marijuana, maintaining a location for unlawfully selling, giving away, or using controlled substances, managing a location for the storage, distribution of any controlled substance for sale, and the laws declaring the use of property for these purposes a nuisance. [¶] . . . *Its specific itemization of the marijuana sales*

*law indicates it contemplates the formation and operation of medicinal marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that marijuana."* (*Urziceanu, supra,* 132 Cal.App.4th at p. 785, italics added.) Thus cooperatives and collectives operated by primary caregivers and/or medical marijuana patients may have a defense to certain narcotics offenses, including those charged against defendants in this case.

In *Urziceanu,* the defendant was charged with conspiracy to sell marijuana. The defendant sought to present evidence that he had established a medical marijuana cooperative called "FloraCare" and could legally distribute marijuana to individuals who had medical certificates for marijuana. The trial court sustained objections to the evidence, and the Court of Appeal reversed. In doing so, the court noted, "defendant produced substantial evidence that suggests he would fall within the purview of section 11362.775. He presented the court with evidence that he was a qualified patient, that is, he had a qualifying medical condition and a recommendation or approval from a physician. His codefendant . . . submitted that same evidence as to herself. Defendant further presented evidence of the policies and procedures FloraCare used in providing marijuana for the people who came to him, including the verification of their prescriptions and identities, the fact that these people paid membership fees and reimbursed the defendant for costs incurred in the cultivation through donations. Further, he presented evidence that members volunteered at the cooperative." (*Urziceanu, supra,* 132 Cal.App.4th at p. 786.) In *Urziceanu,* the collective operated openly with formal, documented practices and procedures for signing up and verifying the eligibility of cooperative members. (*Id.* at pp. 763–766, 786.)

The Court of Appeal in *Urziceanu* concluded these facts presented "substantial evidence that suggests [the defendant] would fall within the purview of section 11362.775." (*Urziceanu, supra,* 132 Cal.App.4th at p. 786.) Accordingly, the Court of Appeal reversed, holding the court erred in not allowing the defendant to use section 11362.775 as a defense to the charge of conspiracy to sell marijuana. (*Urziceanu, supra,* at p. 786.)

Here, however, we are not charged with determining whether the facts are sufficient to allow defendants to raise section 11362.775 as a defense at trial. Rather, we must determine if the facts stated in Detective Garcia's search warrant affidavit gave probable cause to believe defendants were not operating within the confines of the CUA and MMPA. We conclude that Detective Garcia's search warrant affidavit provided probable cause defendants were not operating within the law. We further conclude that even if it did not, a reasonable person would have believed probable cause existed, and therefore the good faith exception to the exclusionary rule applies.

We find persuasive the A.G. Guidelines' opinion that if a storefront dispensary managed by primary caregivers or medical marijuana patients is truly operating as a cooperative or collective, it and its operators might have a defense to arrest and prosecution under section 11362.775. Nothing in section 11362.775, or any other law, prohibits cooperatives and collectives from maintaining places of business. If defendants can produce facts sufficient to show they were operating a true cooperative or collective, and that they were otherwise in substantial compliance with the CUA and MMPA, they may be able to raise section 11362.775 as a defense at trial. However, our analysis is confined to the facts as described in the search warrant affidavit. Those facts and application of relevant law, including the A.G. Guidelines, provide a reasonable suspicion to believe defendants were not operating within the CUA and MMPA.

 First, it appears that purchasers were merely required to "complete a form summarily designating the business owner as their primary caregiver . . . ." (A.G. Guidelines, *supra*, at p. 11.) There was no evidence purchasers had any other relationship with CannaHelp or that they were actual members of a cooperative or collective. These facts are a strong indication of unlawful activity. (*Ibid.*) Moreover, the evidence showed at least some of the marijuana CannaHelp offered for sale was purchased from an outside source, Silva, as opposed to from one or more of its own members. (*Id.* at p. 10.) Further, although it was determined after the fact that CannaHelp was operating at a loss, the large number of transactions, the price of the marijuana, and the cash-only nature of the business provided reasonable grounds for Detective Garcia to believe CannaHelp was not operating as a nonprofit enterprise, also a requirement for operation of cooperatives and collectives. (*Id.* at p. 9; § 11362.765, subd. (a).) Thus, even if facts discovered after the warrant was issued showed a lack of probable cause, Detective Garcia and the executing officers had reasonable grounds to believe they had probable cause at the time the search warrant issued, and the "good faith" exception to the exclusionary rule applies. (*United States v. Leon, supra*, 468 U.S. at pp. 922–923.)

We express no opinion as to whether defendants were in substantial compliance with section 11362.775 and the A.G. Guidelines, and whether, as in *Urziceanu*, there is sufficient evidence for defendants to raise section 11362.775 as a defense at trial. Rather, our only task is to determine whether the facts, as known to Detective Garcia at the time the search warrant issued, demonstrated probable cause to believe defendants were not in compliance with the CUA and MMPA. Because we give great deference to the magistrate's decision to issue a search warrant (*Illinois v. Gates, supra*, 462 U.S. at p. 238) and it is our duty "to save the warrant if [we] can in good conscience do so . . . ." (*Caligari v. Superior Court, supra*, 98 Cal.App.3d at

pp. 729–730), we conclude the court erred in quashing the search warrant and dismissing the charges against defendants.

### D. Detective Garcia's Qualifications

We also conclude the court erred in concluding Detective Garcia was not qualified to author the search warrant. The court's conclusion was based upon its belief that, in opining CannaHelp could not be a primary caregiver, Detective Garcia demonstrated his misunderstanding of the CUA and the MMPA. However, as we have detailed, *ante*, Detective Garcia's conclusion in this regard was correct. Moreover, in the search warrant he detailed his experience in narcotics investigations and accurately defined the term "primary caregiver," thus demonstrating a familiarity with the medical marijuana laws. That experience and knowledge was sufficient to make Detective Garcia competent to author the search warrant affidavit. (See *People v. Superior Court (Moore)* (1980) 104 Cal.App.3d 1001, 1010 [163 Cal.Rptr. 906] [magistrate entitled to consider, in interpreting defendant's telephone conversation with informant, officer's investigation of informant and experience in narcotics investigation]; *People v. Cleland* (1990) 225 Cal.App.3d 388, 393 [275 Cal.Rptr. 126] [seizure of significant amount of marijuana and cash from suspect's person, combined with police officer's opinion that sellers of marijuana often keep additional contraband at home, justified issuance of search warrant for residence].)

Further, Detective Garcia's erroneous conclusion that storefront dispensaries could never operate legally did not render him incompetent to author the search warrant. That conclusion was reasonable, given the uncertainties in the law concerning medical marijuana and the fact that, at that time, there was no California authority expressly authorizing such operations. The A.G. Guidelines, opining that storefront dispensaries may be valid under the CUA and MMPA if they qualify as cooperatives or collectives, were not issued until August of 2008, nearly two years after the investigation and search warrant affidavit. Thus, given the uncertainties in the law at the time Detective Garcia authored the search warrant affidavit, his erroneous conclusion that storefront dispensaries can never be in compliance with the CUA and MMPA does not require an exclusion of the evidence obtained with the search warrant. (See *People v. Garcia* (2003) 111 Cal.App.4th 715, 724 [3 Cal.Rptr.3d 895] [reliance on search warrant reasonable where there was no controlling California authority at the time of the search]; *People v. Pressey* (2002) 102 Cal.App.4th 1178, 1191 [126 Cal.Rptr.2d 162] [same].)

In asserting Detective Garcia did not have the experience necessary to author the search warrant affidavit, defendants (as did the court below) rely on *People v. Chakos* (2007) 158 Cal.App.4th 357 [69 Cal.Rptr.3d 667]. In that case, a deputy sheriff testified at trial that marijuana possessed by an individual with a prescription for medical marijuana was possessed for sale. (*Id.* at pp. 361–362.) However, the officer admitted that he had no knowledge of the CUA and had never before arrested an individual who was a qualified medical marijuana patient. The Court of Appeal held he therefore did not qualify to testify at trial as an expert on the subject and reversed the defendant's conviction. (158 Cal.App.4th at pp. 365, 367–368.)

Here, however, we are not presented with the question of whether Detective Garcia would have been qualified to testify as an expert witness at trial. Rather, we are only concerned with his competence to author a search warrant affidavit. Moreover, as we have explained, his affidavit *did* show he was familiar with the CUA and MMPA. Accordingly, *Chakos* is inapposite.

## IV. *STANDING*

The People contend Campbell and Bednar had no standing to contest the search warrant because they had no reasonable expectation of privacy as they were only managers, not owners, of CannaHelp. We reject this contention.

 To invoke Fourth Amendment protection, an appellant must have both a subjective and an objectively reasonable expectation of privacy, such that society is prepared to recognize that expectation as legitimate. (*California v. Ciraolo* (1986) 476 U.S. 207, 211 [90 L.Ed.2d 210, 106 S.Ct. 1809]; *Katz v. United States* (1967) 389 U.S. 347, 361 [19 L.Ed.2d 576, 88 S.Ct. 507]; *People v. Reyes* (1998) 19 Cal.4th 743, 751 [80 Cal.Rptr.2d 734, 968 P.2d 445].) The "reasonableness of a claimed expectation of privacy depends on the totality of circumstances presented in each case." (*In re Baraka H.* (1992) 6 Cal.App.4th 1039, 1044 [8 Cal.Rptr.2d 221].) The defendant bears the burden of showing he had a legitimate expectation of privacy. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1172 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

Contrary to the People's unsupported assertion, Campbell and Bednar *were* owners of CannaHelp, each having a 25 percent interest in the operation. Accordingly, they had standing to contest the search warrant.

## DISPOSITION

The judgment is reversed.

Benke, Acting P. J., and McIntyre, J., concurred.

Respondents' petitions for review by the Supreme Court were denied December 2, 2009, S176372. Kennard, J., was of the opinion that the petitions should be granted.