[No. G040077. Fourth Dist., Div. Three. Aug. 18, 2010.]

QUALIFIED PATIENTS ASSOCIATION et al., Plaintiffs and Appellants, v. CITY OF ANAHEIM, Defendant and Respondent.

**COUNSEL**

Anthony Curiale for Plaintiffs and Appellants.

Joseph D. Elford for Americans for Safe Access as Amicus Curiae on behalf of Plaintiffs and Appellants.

Mark Leno, in pro. per., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Jack L. White, City Attorney, Cristina Talley, Acting City Attorney, and Moses W. Johnson IV, Assistant City Attorney, for Defendant and Respondent.

Jones & Mayer, Martin J. Mayer, Jamaar Boyd-Weatherby and Krista MacNevin Jee for California State Sheriffs' Association, California Police Chiefs' Association and California Peace Officers' Association as Amici Curiae on behalf of Defendant and Respondent.

Meyers, Nave, Riback, Silver & Wilson, Chrystal B. James and Ellin Davtyan for Cities of Adelanto, Bakersfield, Burbank, Calipatria, Camarillo, Carson, Chino, Compton, Costa Mesa, Cypress, Fairfield, Fountain Valley, Fullerton, Garden Grove, Kerman, Livingston, Newport Beach, Orange, Oakley, Palmdale, Placentia, Plymouth, Ripon, Roseville, San Marcos, Santa Clara, Santa Clarita, Torrance, Tustin, Ukiah, Westminster and Town of Apple Valley as Amici Curiae on behalf of Defendant and Respondent.

William James Murphy, County Counsel (Tehama) and Arthur J. Wylene, Assistant County Counsel, for California State Association of Counties as Amicus Curiae on behalf of Defendant and Respondent.

Edmund G. Brown, Jr., Attorney General, and Peter A. Krause, Deputy Attorney General, as Amici Curiae upon the request of the Court of Appeal.

## OPINION

**ARONSON, J.**—Plaintiffs Qualified Patients Association (QPA) and Lance Mowdy appeal from a judgment of dismissal entered after the trial court sustained, without leave to amend, the City of Anaheim's demurrer to plaintiffs' complaint. Asserting the primacy of state law over local law under constitutional and statutory authority (Cal. Const., art. XI, § 7; Gov. Code, § 37100), plaintiffs' first cause of action sought a declaratory judgment that the city's ordinance imposing criminal penalties for the operation of a medical marijuana dispensary was preempted by the Compassionate Use Act of 1996 (CUA) (Health & Saf. Code, § 11362.5)[1] and the Medical Marijuana Program Act (MMPA) (§§ 11362.7–11362.83). In their second cause of action, plaintiffs asserted the city's ordinance violated the Unruh Civil Rights Act (Civ. Code, § 51).

We agree with plaintiffs the trial court erred as a matter of law in concluding federal regulation of marijuana in the Controlled Substances Act (21 U.S.C. § 812 et seq.) preempted California's decision in the CUA and the MMPA to decriminalize specific medical marijuana activities under state law. We therefore reverse the judgment of dismissal and remand the matter to allow plaintiffs to pursue their declaratory judgment cause of action. The trial court, however, correctly concluded plaintiffs failed to state a cause of action under the Unruh Civil Rights Act, which is aimed at "business establishments" (Civ. Code, § 51, subd. (b)), not local government legislative acts. We therefore affirm that portion of the judgment.

I

### FACTUAL AND PROCEDURAL BACKGROUND

In a provision entitled, " 'Medical Marijuana Dispensary Prohibited,' " the city ordinance that plaintiffs challenge provides: " 'It shall be unlawful for any person or entity to own, manage, conduct, or operate any Medical

---

[1] All further statutory references are to the Health and Safety Code unless otherwise specified.

Marijuana Dispensary or to participate as an employee, contractor, agent or volunteer, or in any other manner or capacity, in any Medical Marijuana Dispensary in the City of Anaheim.' " (Anaheim Ord. No. 6067, § 1; see Anaheim Mun. Code, § 4.20.030.)

Anaheim Ordinance No. 6067, section 1, defines a " ' "Medical marijuana dispensary or dispensary" ' " as " 'any facility or location where medical marijuana is made available to and/or distributed by or to three or more of the following: a qualified patient, a person with an identification card, or a primary caregiver.' " (See Anaheim Mun. Code, § 4.20.020.030.)

The ordinance provides, in section 5, for misdemeanor punishment for "any person who violates any provision of this ordinance . . . ."

Plaintiffs' first cause of action sought a declaratory judgment that the state's medical marijuana laws preempted the city's ordinance. Based on its conclusion federal law preempted the state's medical marijuana laws, the trial court sustained the city's demurrer to plaintiffs' first cause of action, without leave to amend. The trial court also sustained without leave to amend the city's demurrer to plaintiffs' second cause of action, which asserted the city's ordinance discriminated against them on the basis of a "disability" or "medical condition" in violation of the Unruh Civil Rights Act. (Civ. Code, § 51.) The trial court observed, "Courts generally take a dim view of the assertion or claim to a right to do something that is illegal." The trial court also concluded the act did not apply to legislative bodies but rather only to "business establishments." (Civ. Code, § 51, subd. (b).) Plaintiffs now appeal.

II

DISCUSSION

A. *Applicable Authority*

1. *The CUA*

California voters approved Proposition 215 in 1996, codified as the Compassionate Use Act of 1996 at section 11362.5. (See *People v. Trippet* (1997) 56 Cal.App.4th 1532, 1546 [66 Cal.Rptr.2d 559] (*Trippet*); *People v. Tilehkooh* (2003) 113 Cal.App.4th 1433, 1436 [7 Cal.Rptr.3d 226] (*Tilehkooh*).) Subdivision (d) of section 11362.5 provides: "Section 11357, relating to the possession of marijuana, and [s]ection 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."

■ Examining this language, *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 772–773 [33 Cal.Rptr.3d 859] (*Urziceanu*), explained that "the Compassionate Use Act is a narrowly drafted statute designed to allow a qualified patient and his or her primary caregiver to possess and cultivate marijuana for the patient's personal use despite the penal laws that outlaw these two acts for all others." The *Urziceanu* court observed that, apart from possession and cultivation, "the Compassionate Use Act did not alter the other statutory prohibitions related to marijuana, including those that bar the transportation, possession for sale, and sale of marijuana." (*Urziceanu, supra,* 132 Cal.App.4th at p. 773; see also *Trippet, supra,* 56 Cal.App.4th at p. 1550 [recognizing the CUA's literal terms left primary caregivers vulnerable for transporting marijuana down a hallway to their patients].) The court continued: "When the people of this state passed [the CUA], they declined to decriminalize marijuana on a wholesale basis. As a result, the courts have consistently resisted attempts by advocates of medical marijuana to broaden the scope of these limited specific exceptions. We have repeatedly directed the proponents of this approach back to the Legislature and the citizenry to address their perceived shortcomings with this law." (*Urziceanu,* at p. 773.) Accordingly, *Urziceanu* held: "A cooperative where two people grow, stockpile, and distribute marijuana to hundreds of qualified patients or their primary caregivers, while receiving reimbursement for these expenses, does not fall within the scope of the language of the Compassionate Use Act or the cases that construe it." (*Ibid.*) Later in its opinion, the *Urziceanu* court examined whether the terms of the MMPA required a different conclusion, as we discuss below.

As noted in *Urziceanu,* the exemptions provided in the CUA for a qualified patient to possess and cultivate medical marijuana also apply to his or her primary caregiver. The CUA defines a "primary caregiver" as "the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person." (§ 11362.5, subd. (e).)

■ The California Supreme Court has explained that to be a primary caregiver under this section, an individual must show that "he or she (1) consistently provided caregiving, (2) independent of any assistance in taking medical marijuana, (3) at or before the time he or she assumed responsibility for assisting with medical marijuana." (*People v. Mentch* (2008) 45 Cal.4th 274, 283 [85 Cal.Rptr.3d 480, 195 P.3d 1061] (*Mentch*).) The high court in *Mentch* concluded that a patient may not confer primary caregiver status merely by designating a person as a primary caregiver, nor does a person qualify simply by providing medical marijuana to the patient. (*Id.* at pp. 283–285.) Rather, the person must show "a caretaking relationship directed at the core survival needs of a seriously ill patient, not just one single pharmaceutical need." (*Id.* at p. 286.)

The electorate, in enacting the CUA, "directed the state to create a statutory plan to provide for the safe and affordable distribution of medical marijuana to qualified patients." (*People v. Hochanadel* (2009) 176 Cal.App.4th 997, 1014 [98 Cal.Rptr.3d 347] (*Hochanadel*).) The electorate's stated intent in enacting the CUA was three-fold: first, to "ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of [designated illnesses] or any other illness for which marijuana provides relief"; second, to "ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes under the recommendation of a physician are not subject to criminal prosecution or sanction"; and third, to "encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." (§ 11362.5, subd. (b)(1)(A)–(C).)

### 2. *The MMPA*

In 2003, the Legislature enacted the Medical Marijuana Program Act, effective January 1, 2004, adding sections 11362.7 through 11362.83 to the Health and Safety Code. (See *People v. Wright* (2006) 40 Cal.4th 81, 93 [51 Cal.Rptr.3d 80, 146 P.3d 531] (*Wright*).) The express intent of the Legislature was to "(1) Clarify the scope of the application of the [CUA] and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law enforcement officers. [¶] (2) Promote uniform and consistent application of the act among the counties within the state. [¶] (3) Enhance the access of patients and caregivers to medical marijuana through *collective, cooperative cultivation projects.*" (Stats. 2003, ch. 875, § 1(b)(1)–(3), italics added.) The MMPA also expressly stated: "It is . . . the intent of the Legislature to address additional issues that were not included within the [CUA], and that must be resolved in order to promote the fair and orderly implementation of the [CUA]." (Stats. 2003, ch. 875, § 1(c).) According to the act's legislative history, "*Nothing in [the MMPA] shall amend or change Proposition 215, nor prevent patients from providing a defense under Proposition 215 . . . . The limits set forth in [the MMPA] only* serve to provide immunity from arrest for patients taking part in the voluntary ID card program, *they do not change [s]ection 11362.5* (Proposition 215) . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 420 (2003–2004 Reg. Sess.) as amended Sept. 9, 2003, pp. 6–7, italics added.)

In section 11362.71, the MMPA established a program to facilitate the " 'prompt identification of qualified patients and their designated primary

caregivers' " (*Wright, supra*, 40 Cal.4th at p. 93) via a voluntary identification card program, which the Legislature required counties to implement (§§ 11362.71, subd. (b), 11362.72; see *County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 811, 818, 825–828 [81 Cal.Rptr.3d 461] (*County of San Diego*) [holding federal law making marijuana illegal did not preempt the MMPA's identification card program]).

Particularly relevant to this appeal, the MMPA also added section 11362.775, which provides: "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order *collectively or cooperatively to cultivate marijuana for medical purposes*, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357 [(possession of marijuana)], 11358 [(cultivation of marijuana)], 11359 [(possession for sale)], 11360 [(transportation)], 11366 [(maintaining a place for the sale, giving away or use of marijuana)], 11366.5 [(making available premises for the manufacture, storage or distribution of controlled substances)], or 11570 [(abatement of nuisance created by premises used for manufacture, storage or distribution of controlled substance)]." (Italics added.)

In *Urziceanu*, the court observed that "[t]his new law represents a dramatic change in the prohibitions on the use, distribution, and cultivation of marijuana for persons who are qualified patients or primary caregivers . . . . Its specific itemization of the marijuana sales law indicates it contemplates the formation and operation of medicinal marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that marijuana." (*Urziceanu, supra*, 132 Cal.App.4th at p. 785.)

Adding detail to California's quilt of medical marijuana legislation, the MMPA, in section 11362.765, expressly immunizes from state criminal liability, in relation to lawful medical marijuana use, "*Any individual* who provides assistance to a qualified patient or a person with an identification card, or his or her designated primary caregiver, in *administering* medical marijuana to the qualified patient or person or *acquiring the skills* necessary *to cultivate* or *administer* marijuana for medical purposes to the qualified patient or person." (§ 11362.765, subd. (b)(3), italics added; see *id.*, subd. (a) ["Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be subject, on that sole basis, to criminal liability under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570."].)

The MMPA also expressly immunizes "[a] *qualified patient or a person with an identification card* who *transports or processes* marijuana for his or

her own *personal* medical use." (§ 11362.765, subd. (b)(1), italics added.) Section 11362.765, subdivision (b)(2), similarly immunizes primary caregivers, specifically any "designated *primary caregiver who transports, processes, administers, delivers,* or *gives away* marijuana for medical purposes . . . *only to the qualified patient of the primary caregiver, or to the person with an identification card who has designated the individual as a primary caregiver.*" (Italics added.) Subdivision (c) of section 11362.765 addresses compensation. It mandates that "[a] primary caregiver who receives compensation for actual expenses, including reasonable compensation incurred for services provided to an eligible qualified patient or person with an identification card to enable that person to use marijuana under this article, or for payment for out-of-pocket expenses incurred in providing those services, or both, shall not, on the sole basis of that fact, be subject to prosecution or punishment under Section 11359 or 11360."

The MMPA also "elaborates on" the definition of primary caregiver in the CUA. (*Hochanadel, supra,* 176 Cal.App.4th at p. 1008.) The MMPA reiterates the definition of a primary caregiver contained in the CUA, i.e., "the individual, designated by a qualified patient . . . who has consistently assumed responsibility for the housing, health, or safety of that patient or person :. . . ." (§ 11362.7, subd. (d).) The subdivision goes on to provide examples of the Legislature's view of persons qualifying as primary caregivers under this definition: (1) Owners and operators of clinics or care facilities; (2) "An individual who has been designated as a primary caregiver by more than one qualified patient or person with an identification card, if every qualified patient or person with an identification card who has designated that individual as a primary caregiver resides in the same city or county as the primary caregiver"; and (3) "An individual who has been designated as a primary caregiver by a qualified patient or person with an identification card who resides in a city or county other than that of the primary caregiver, if the individual has not been designated as a primary caregiver by any other qualified patient or person with an identification card." (§ 11362.7, subd. (d)(1)–(3).)

The MMPA bars individuals and any collective, cooperative, or other group from transforming medical marijuana projects authorized under the MMPA into for-profit enterprises. (§ 11362.765, subd. (a) ["nothing in this section shall authorize . . . any individual or group to cultivate or distribute marijuana for profit"].)

3. *Attorney General Guidelines*

Section 11362.81, subdivision (d), of the MMPA provides: "[T]he Attorney General shall develop and adopt appropriate guidelines to ensure the security

and nondiversion of marijuana grown for medical use by patients qualified under the [CUA]." On August 25, 2008, the California Attorney General issued Guidelines for the Security and Non-diversion of Marijuana Grown for Medical Use (Attorney General Guidelines, or Guidelines) <http://ag.ca.gov/cms_attachments/press/pdfs/n1601_medicalmarijuanaguidelines.pdf> (as of Aug. 18, 2010). The Attorney General Guidelines' stated purpose is to "(1) ensure that marijuana grown for medical purposes remains secure and does not find its way to non-patients or illicit markets, (2) help law enforcement agencies perform their duties effectively and in accordance with California law, and (3) help patients and primary caregivers understand how they may cultivate, transport, possess, and use medical marijuana under California law." (Guidelines, *supra*, at p. 1.)

The Attorney General Guidelines provide a definition of "cooperatives" and "collectives." The Guidelines observe that "[n]o business may call itself a 'cooperative' (or 'co-op') unless it is properly organized and registered as such a corporation under the Corporations or Food and Agricultural Code." (Attorney General Guidelines, at p. 8; see Corp. Code, §§ 12201, 12300.) A cooperative "must file articles of incorporation with the state and conduct its business for the mutual benefit of its members. [Citation.] . . . Cooperative corporations are '*democratically controlled* and are *not organized to make a profit* for themselves, as such, or for their members, as such, but primarily for their members as patrons.' [Citation.]" (Guidelines, at p. 8, italics added.) Further, "[c]ooperatives must follow strict rules on organization, articles, elections, and *distribution of earnings*, and must report individual transactions from individual members each year." (*Ibid.*, italics added.) Turning to the dictionary, the Attorney General Guidelines define a "collective" as " 'a business, farm, etc., *jointly owned and operated* by the members of a group.' [Citation.]" (*Ibid.*, italics added.) Given this joint ownership and operation requirement, "a collective should be an organization that merely facilitates the collaborative efforts of patient and caregiver members—including the allocation of costs and revenues." (*Ibid.*)

Pursuant to these definitions, the Attorney General concludes in the Guidelines that a cooperative or collective "should not purchase marijuana from, or sell to, non-members; instead, it should only provide a means for facilitating or coordinating transactions between members." (Attorney General Guidelines, *supra*, at p. 8.)

The Attorney General Guidelines articulate additional requirements for the lawful operation of cooperatives and collectives, including that they must be nonprofit operations. (Attorney General Guidelines, *supra*, at p. 9.) They may "acquire marijuana *only from their constituent members*, because only marijuana grown by a qualified patient or his or her primary caregiver may

lawfully be transported by, or distributed to, other members of a collective or cooperative. [Citations.] . . . *Nothing allows marijuana to be purchased from outside the collective or cooperative for distribution to its members.* Instead, the cycle should be a *closed-circuit* of marijuana cultivation and consumption with no purchases or sales to or from non-members. To help prevent diversion of medical marijuana to non-medical markets, collectives and cooperatives should document each member's contribution of labor, resources, or money to the enterprise. They should also track and record the source of their marijuana." (*Id.* at p. 10, italics added.)

Distribution or sale to nonmembers is prohibited: "State law allows primary caregivers to be reimbursed for certain services (including marijuana cultivation), but nothing allows individuals or groups to sell or distribute marijuana to non-members. Accordingly, a collective or cooperative may not distribute medical marijuana to any person who is not a member in good standing of the organization. A dispensing collective or cooperative may credit its members for marijuana they provide to the collective, which it may then allocate to other members. [Citation.] Members also may reimburse the collective or cooperative for marijuana that has been allocated to them. Any monetary reimbursement that members provide to the collective or cooperative should only be an amount necessary to cover overhead costs and operating expenses." (Attorney General Guidelines, *supra*, at p. 10.)

Finally, to aid law enforcement in determining whether marijuana-related activities comply with the CUA and MMPA, the Attorney General Guidelines specifically address "Storefront Dispensaries." (Attorney General Guidelines, *supra*, at p. 11.) The Attorney General concludes in the Guidelines that while "dispensaries, as such, are not recognized under the law," "a properly organized and operated collective or cooperative that dispenses medical marijuana through a storefront may be lawful under California law, but . . . dispensaries that do not substantially comply with the guidelines [covering collectives and cooperatives] are likely operating outside the protections of [the CUA] and the MMP[A], and . . . the individuals operating such entities may be subject to arrest and criminal prosecution under California law. *For example, dispensaries that merely require patients to complete a form summarily designating the business owner as their primary caregiver—and then offering marijuana in exchange for cash 'donations'—are likely unlawful."* (Attorney General Guidelines, *supra*, at p. 11, italics added.)

■ "While the Attorney General's views do not bind us [citation], they are entitled to considerable weight [citation]." (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 829 [25 Cal.Rptr.2d 148, 863 P.2d 218].)

## B. *The MMPA Does Not Unconstitutionally Amend the CUA*

■ The city asserts the MMPA unconstitutionally amends the CUA. The California Constitution bars the Legislature from amending an initiative measure unless the measure itself authorizes amendment. (Cal. Const., art. II, § 10, subd. (c); *People v. Cooper* (2002) 27 Cal.4th 38, 44 [115 Cal.Rptr.2d 219, 37 P.3d 403].) It is undisputed the CUA does not provide for legislative amendment. The city's challenge fails, however, because the MMPA does not amend the CUA, as the court in *Hochanadel, supra,* 176 Cal.App.4th 997 explained.

*Hochanadel* rejected the same amendment argument the city advances. There, "[t]he People assert[ed] that section 11362.775, which exempts medical marijuana patients, persons with valid medical marijuana identification cards and their primary caregivers who form collectives or cooperatives to cultivate marijuana from prosecution for several drug-related crimes, constituted an unconstitutional amendment of the CUA." (*Hochanadel, supra,* 176 Cal.App.4th at p. 1011.) Here, the city contends that section 11362.775 of the MMPA, "by dramatically changing the CUA[,] has unconstitutionally amended it."

■ In *Hochanadel*, the court explained this line of attack is "unavailing" because the MMPA " 'amended provisions *of the Health and Safety Code* regarding regulation of drugs adopted by the Legislature, *not provisions of the CUA.*' " (*Hochanadel, supra,* 176 Cal.App.4th at pp. 1011, 1013, italics added.) The court concluded: " 'Because the MMP[A]'s [cooperative and collective] program has no impact on the protections provided by the CUA, we reject [the] claim that those provisions are invalidated by . . . the California Constitution.' " (*Id.* at p. 1013, second brackets added.) Elaborating, the court observed that section 11362.775 "did not constitute an amendment of the CUA as it was not intended to, and did not, alter the rights provided by the CUA. Rather, it identifies groups that may lawfully distribute medical marijuana to patients under the CUA. Thus, it was designed to *implement*, not amend the CUA." (*Hochanadel*, at p. 1013, original italics.) "Indeed," the court noted, "the CUA itself directed the state to create a statutory plan to provide for the safe and affordable distribution of medical marijuana to qualified patients. (§ 11362.5, subd. (b)(1)(C).) Thus, in enacting section 11362.775 the Legislature created what the CUA expressly contemplated and did not unconstitutionally amend the CUA." (*Hochanadel*, at p. 1014.)

We agree with *Hochanadel*. The city relies on language in *Urziceanu* stating that the MMPA "*represents a dramatic change* in the prohibitions on the use, distribution, and cultivation of marijuana . . . . Its specific itemization

of the marijuana sales law indicates it contemplates the formation and operation of medicinal marijuana cooperatives . . . ." (*Urziceanu, supra,* 132 Cal.App.4th at p. 785, italics added.) The initiative may have prompted the Legislature to add or change other laws, but this does not mean it amended the initiative.

■ The purpose of the Constitution's ban on legislative amendments is to " ' " 'jealously guard' " ' " the electorate's initiative power from intermeddling by the Legislature. (*People v. Kelly* (2010) 47 Cal.4th 1008, 1025, 1030 [103 Cal.Rptr.3d 733, 222 P.3d 186] [" 'No other state in the nation carries the concept of initiatives as "written in stone" to such lengths . . .' " as California].) Accordingly, "amendments which *may* conflict with the subject matter of initiative measures must be accomplished by popular vote, as opposed to legislative[] enact[ment] . . . ." (*Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1486 [76 Cal.Rptr.2d 342], original italics.) Contrary to the city's position, however, the purpose of the constitutional ban on amendments is not implicated here. As the Supreme Court in *Kelly* observed, "[D]espite the strict bar on the Legislature's authority to amend initiative statutes, judicial decisions have observed that this body is not thereby precluded from enacting laws addressing the general subject matter of an initiative." (*Kelly,* at p. 1025.)

■ *Hochanadel* explained that the MMPA did not amend the CUA. Rather, the MMPA amended, consistent with the CUA, the Health and Safety Code provisions barring the transportation, distribution and cooperative or collective cultivation of marijuana. (See *Hochanadel, supra,* 176 Cal.App.4th at p. 1013.) By providing immunity from prosecution for those activities when conducted in compliance with state law, the MMPA changed the Health and Safety Code. Because the CUA did not touch on these topics (see § 11362.5, subd. (d) [affording immunity only for personal possession and cultivation of medicinal marijuana]), it necessarily follows that the MMPA did not expand or restrict the CUA in the manner necessary to constitute an amendment (see *Franchise Tax Bd. v. Cory* (1978) 80 Cal.App.3d 772, 776 [145 Cal.Rptr. 819] ["A statute which adds to or takes away from an existing statute is considered an amendment."]). Rather, without treading on the electorate's superior power, the Legislature properly acted within its sphere to define specific transportation, distribution, and collective or cooperative activities as noncriminal. (See *People v. Mills* (1978) 81 Cal.App.3d 171, 176–177 [146 Cal.Rptr. 411] ["The definition of crime and the determination of punishment are foremost among those matters that fall within the legislative domain."].) Consequently, we reject the argument the MMPA constitutes an amendment of the CUA.

C. *Whether State Law Preempts the City's Ordinance*

 1. *Standing*

■ Plaintiffs' first cause of action sought a declaratory judgment that the city's ordinance is preempted by state medical marijuana law embodied in the CUA and MMPA. The city contends plaintiffs lack standing to obtain declaratory relief. The city did not demur to plaintiffs' complaint on this ground, but lack of standing constitutes a jurisdictional defect and therefore may be raised at any time, even for the first time on appeal. (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 438 [261 Cal.Rptr. 574, 777 P.2d 610]; *Color-Vue, Inc. v. Abrams* (1996) 44 Cal.App.4th 1599, 1603–1604 [52 Cal.Rptr.2d 443].) ■ Plaintiffs' declaratory judgment action requires an "actual controversy relating to the legal rights and duties of the respective parties." (Code Civ. Proc., § 1060.) "Courts will decline to resolve lawsuits that do not present a justiciable controversy, and justiciability 'involves the intertwined criteria of ripeness and standing.' " (*County of San Diego, supra*, 165 Cal.App.4th at p. 813.) The standing issue here consists of whether, simply put, plaintiffs have "incurred an injury capable of redress." (*New York Times Co. v. Superior Court* (1990) 51 Cal.3d 453, 466 [273 Cal.Rptr. 98, 796 P.2d 811].)

■ The city argues plaintiffs can obtain no redress from a preemption determination because they cannot show they fall within the CUA's and MMPA's protection. But "[a] general demurrer is usually not an appropriate method for testing the merits of a declaratory relief action, because the plaintiff is entitled to a declaration of rights even if it is adverse to the plaintiff's interest." (Cal. Judges Benchbook: Civil Proceedings Before Trial (CJER 2d ed. 2008) Attacks on Pleadings, § 12.83, p. 52 (hereafter Judges Benchbook).) This is particularly true here because factual issues abound on whether plaintiffs' activities place them in the category of a lawful "cooperative" or "collective" under the MMPA, and whether plaintiffs are in fact "qualified patients" or "primary caregivers" under the act. (See Judges Benchbook, *supra*, § 12.83, p. 52 [demurrer inappropriate where factual issues remain].)

The city's oft-repeated, pejorative characterization of QPA as a "storefront dispensary," rather than a "cooperative" or "collective," is not persuasive. The city seems to suggest that any medical marijuana outlet it designates as a "dispensary" affronts California medical marijuana law.[2] The city's argument

---

[2] As noted in *Mentch*, California is not alone, nor an outlier among the states in decriminalizing medical marijuana; at least 12 states have done so despite the continuing federal ban, and the majority of those states have established a more lenient threshold for creating an authorized primary caregiver relationship. (See *Mentch, supra*, 45 Cal.4th at p. 287, fn. 8.)

fails for two reasons. First, we are here after demurrer, and QPA is identified nowhere in the complaint or any judicially noticeable material as a "storefront dispensary." Second, the "dispensary" label—even assuming it is apt—is not dispositive. As the Attorney General observes in the Guidelines, while "dispensaries, as such, are not recognized under the law," "a properly organized and operated collective or cooperative that dispenses medical marijuana through a storefront may be lawful under California law . . . ." (Attorney General Guidelines, *supra*, p. 11.) We perceive no reason at this juncture to disagree with the Attorney General's assessment.

The city points to Mowdy's claim in the complaint that he is the "designated primary caregiver for the members of the Association," which consists of *"more than fifty* qualified patients" (italics added), as facts disqualifying him, QPA, and its members from state law protection. Relying on *Mentch*, the city observes, "the many customers of a marijuana 'association,' here the Qualified Patients Ass'n (QPA), cannot execute pro forma designations of the QPA [or Mowdy] as their primary caregiver." (Original brackets.) The city concludes: "The QPA [or Mowdy] cannot qualify as a primary caregiver in these circumstances. A person purchasing marijuana for medicinal purposes cannot simply designate seriatim, and on an ad hoc basis, sales centers such as the QPA [or Mowdy] as the patient's 'primary caregiver.' " (Original brackets.) (See *Mentch, supra*, 45 Cal.4th at p. 284.)

But nothing in the complaint, nor any judicially noticeable material, discloses that Mowdy's relationship with QPA patients is one of mere pro forma designation. True, Mowdy's assertion he is a "primary caregiver" does not, by itself, establish he qualifies for that legal status under the CUA and the MMPA, for we do not credit mere conclusions of law stated in the complaint. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) But neither may we prejudge, as the city would have us do, that Mowdy is not a legitimate "primary caregiver" absent facts that disqualify him. Nor, similarly, may we simply conclude QPA is not a collective or cooperative or that it is not comprised of qualified patients. A demurrer lies for lack of standing when the defect appears *on the face of the pleading or from judicially noticeable matters.* (See, e.g., *Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276]; *Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 19 [108 P.2d 906]; *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1095 [9 Cal.Rptr.3d 286].) As discussed, that is not the case here. A summary judgment motion, not demurrer as the city would have it, may be deployed to "cut through the . . . pleadings" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493]) on whether Mowdy in fact qualifies as a primary caregiver and whether QPA is a collective, a cooperative or comprised of qualified patients. As we explain below, we do not reach the issue of whether state law preempts the city's ordinance. But at this stage of

the proceedings, the city's attempt on appeal to torpedo plaintiffs' preemption claim on grounds the CUA and the MMPA do not apply to them is premature. (See Chemerinsky, Constitutional Law, Principles and Policies (2d ed. 2002) § 2.5, p. 78 [criticizing redressability determinations made prematurely on the basis of the pleadings].)

### 2. *The State Law Preemption Issue Is Not Ripe for Our Review*

We do not decide whether the CUA or the MMPA preempts the city's ordinance because we conclude the issue is not properly before us. Plaintiffs did not appeal the trial court's order denying their request for a preliminary injunction restraining enforcement of the ordinance on preemption grounds. (Code Civ. Proc., § 904.1, subd. (a)(6) [an order granting or denying an injunction is appealable]; *Socialist Workers etc. Committee v. Brown* (1975) 53 Cal.App.3d 879, 885, fn. 4 [125 Cal.Rptr. 915] [same].) Plaintiffs provide no authority and make no argument concerning the legal standards for a preliminary injunction. Accordingly, we express no opinion on whether their request for a preliminary injunction should have been granted, or whether state law preempts the city's ordinance. The only issue before us is the trial court's ruling, founded on the preemptive power of federal law, sustaining the city's demurrer to the complaint without leave to amend.

True, the trial court expressed skepticism concerning plaintiffs' claim that state law preempts the city's ordinance. But the trial court's demurrer ruling refers specifically only to the CUA and the Unruh Civil Rights Act, not the MMPA. The authorities cited in the trial court's order, including *Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920 [70 Cal.Rptr.3d 382, 174 P.3d 200] *(Ross)*, did not involve the MMPA.[3] (See *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 680 [36 Cal.Rptr.3d 495, 123 P.3d 931] [" 'An opinion is not authority for propositions not considered.' "].)

The trial court apparently did not consider whether the MMPA's provisions that are distinct from the CUA, including sections 11362.765 and 11362.775, preempt the city's ordinance. The court in *People ex rel. Lungren v. Peron* (1997) 59 Cal.App.4th 1383, 1390 [70 Cal.Rptr.2d 20], held that the "general availability of injunctive relief under section 11570 against buildings and drug houses used to sell controlled substances is not affected by" *the CUA.* The Legislature subsequently enacted the MMPA. Sections 11362.765 and 11362.775 of the MMPA immunize operators of medical marijuana dispensaries—provided they are qualified patients, possess valid medical marijuana identification cards, or are primary caregivers—from prosecution under state

---

[3] In *Ross*, the Supreme Court concluded the CUA did not prohibit an employer from terminating an employee for using medical marijuana.

nuisance abatement law (§ 11570) "solely on the basis" that they use any "building or place . . . for the purpose of unlawfully selling, serving, storing, keeping, manufacturing, or giving away any controlled substance . . . ." Sections 11362.765 and 11362.775 also provide qualifying persons immunity from nonfederal criminal sanctions imposed "solely on the basis" of "open-[ing] or maintain[ing] any place for the purpose of unlawfully selling, giving away, or using any controlled substance . . . ." (§ 11366) or for "rent[ing], leas[ing], or mak[ing] available for use . . . [a] building, room, space, or enclosure for the purpose of unlawfully manufacturing, storing, or distributing any controlled substance . . . ." (§ 11366.5).

Whether the MMPA bars local governments from using nuisance abatement law and penal legislation to prohibit the use of property for medical marijuana purposes remains to be determined.[4] Unlike in *Ross*, where the Supreme Court observed that "[t]he operative provisions of the [CUA] do not speak to employment law" (*Ross, supra*, 42 Cal.4th at p. 928), the MMPA explicitly touches on land use law by proscribing in sections 11362.765 and 11362.775 the application of sections 11570, 11366, and 11366.5 to uses of property involving medical marijuana. Here, viewing the allegations of the complaint most favorably to plaintiffs, as is required on demurrer, it appears incongruous at first glance to conclude a city may criminalize as a misdemeanor a particular use of property the state expressly has exempted from "criminal liability" in sections 11362.765 and 11362.775. Put another way, it seems odd the Legislature would disagree with federal policymakers about including medical marijuana in penal and drug house abatement legislation (compare 21 U.S.C. §§ 812 & 856 with Health & Saf. Code, §§ 11362.765 & 11362.775), but intend that local legislators could side with their federal—instead of state—counterparts in prohibiting and criminalizing property uses "solely on the basis" of medical marijuana activities. (§§ 11362.765 & 11362.775.) After all, local entities are creatures of the state, not the federal, government.

But in supplemental briefing at our invitation, the city and its amici curiae demonstrate the issue of state preemption under the MMPA is by no means clear cut or easily resolved on first impressions. They argue with much

---

[4] *City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153 [100 Cal.Rptr.3d 1], on which the city relies, did not involve an ordinance like Anaheim's, which potentially contradicts sections 11362.765 and 11362.775 by making the use of property a crime "solely on the basis" of otherwise lawful medical marijuana activity. The city also relies on *City of Corona v. Naulls* (2008) 166 Cal.App.4th 418 [83 Cal.Rptr.3d 1], which did not involve or discuss section 11362.765 or 11362.775, nor section 11366, 11366.5, or 11570. Additionally, unlike the scenario here, both *Kruse* and *Naulls* involved plaintiffs that ignored or circumvented established procedures for obtaining a business license, instead of seeking a declaratory judgment. And both cases involved temporary moratoriums rather than the permanent dispensary ban alleged here. Again, cases are not determinative for issues not considered.

appeal, for example, that if the immunity from "criminal liability" provided in sections 11362.765 and 11362.775 applies to "the well-recognized quasi-criminal nature of [s]ection 11570," the "careful phrasing of the MMPA provides no suggestion that this narrow exclusion was intended to wholly eliminate *any* remedy for activities determined to be an *ordinary* nuisance under . . . legal authority" apart from section 11570.[5] (Original italics; see also 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 70, p. 144 [noting § 11570 qualifies as "civil in nature," but also "quasi-criminal in effect" and "character"].) We do not decide these issues.

As anxious as we, the parties, and amici curiae are to reach this important and interesting question of state preemption, this case in its present posture is not the occasion to do so. Because it appears the trial court, apart from the asserted fundamental defect of federal preemption, did not address or determine that plaintiffs failed to state a claim for declaratory relief under the MMPA, as opposed to the CUA or Unruh Civil Rights Act, it is not our province to do so in the first instance. Moreover, as noted, factual issues that we may not resolve on appeal remain, including whether plaintiffs qualify as primary caregivers or otherwise for the MMPA's asserted protection against

---

[5] Observing that section 11570 "deems '*[e]very* building or place used for the purpose of unlawfully selling, serving, storing, keeping, manufacturing, or giving away any controlled substance' to be a public nuisance," counsel for Tehama County, as amicus curiae for the city, argues: "At very most, the MMPA's exclusion of qualified persons from [s]ection 11570 would preempt an ordinance that similarly attempted to proscribe every premises upon which qualified medical marijuana activities take place." (Original italics.) According to counsel, "Anaheim's Ordinance No. 6067 does no such thing. Rather, the Ordinance prohibits a certain *manner* of conducting such activities within City limits, specifically by regulating the number of persons that may engage in such activity upon a single premises. (See Anaheim Mun. Code, § 4.20.020 [defining a regulated dispensary as a 'facility or location where medical marijuana is made available to and/or distributed by or to *three or more*' qualified persons].)" (Original italics.)

The city views its ordinance as a complete ban on typical medical marijuana dispensaries. A ban accomplished by local legislation is lawful, according to the city, because "[t]he Legislature, in adopting the MMP[A], did not exempt qualified persons from a[ll] criminal or civil liability, only specified criminal statutes." The city also argues that the immunities provided in section 11362.775 apply, by the terms of the statute, only to collective or cooperative "cultivat[ion]" of medical marijuana. Conceivably, the agricultural and group nature of such an undertaking might heighten a local government's interest in regulating or banning such uses, particularly in a dense urban environment. If the city is correct, however, that the MMPA authorizes combined efforts only for cultivating marijuana and not for activities such as storing or dispensing it away from the cultivation site (compare § 11362.775 with § 11362.765), the absence of a collective or cooperative means to distribute medical marijuana to qualified persons may suggest the Legislature intended nearby access through widespread cultivation locations. On this view, local authorities would have grounds to ban typical dispensaries if they lack a role in the actual cultivation process, but perhaps not bar altogether, for example, cooperative marijuana gardens or collective cultivation sites where qualified patients or their primary caregivers could obtain their medication.

an ordinance imposing criminal punishment for operating a dispensary, and the manner in which plaintiffs intend to conduct their medical marijuana activities.

In our common law tradition, the "legal rules that emerge from judicial opinions are 'precepts attaching a definite detailed legal consequence to a definite, detailed state of facts.'" (Aldisert, *Max Rosenn: An Ideal Appellate Judge* (2006) 154 U.Pa. L.Rev. 1025, 1030–1031, quoting Pound, *Hierarchy of Sources and Forms in Different Systems of Law* (1933) 7 Tul. L.Rev. 475, 482.) Here, we have precious few facts concerning plaintiffs' planned medical marijuana activities. At demurrer, on the few facts known about the manner in which QPA intends to operate, we cannot say plaintiffs have failed to state a cause of action to obtain declaratory judgment on whether the MMPA preempts the city's ordinance.

In sum, demurrer is not the proper context to reach and resolve the merits of plaintiffs' claim for declaratory judgment. "When," as here, "the complaint sets forth facts showing the existence of an actual controversy between the parties relating to their respective legal rights and duties and requests that these rights and duties be adjudged, the plaintiff has stated a legally sufficient complaint for declaratory relief. It is an abuse of discretion for a judge to sustain a demurrer to such a complaint and to dismiss the action, even if the judge concludes that the plaintiff is not entitled to a favorable declaration." (Judges Benchbook, *supra*, § 12.83, p. 52.) As noted, "the plaintiff is entitled to a declaration of rights even if it is adverse to the plaintiff's interest." (*Ibid.*) We express no opinion on the merits of the parties' positions, but instead remand to allow the parties and the trial court to address these issues in further proceedings, including summary judgment or trial, if triable issues of fact remain unresolved.[6]

We now turn to the trial court's conclusion the city was entitled to prevail on demurrer based on federal preemption.

## D. *Federal Law Does Not Preempt the CUA or the MMPA*

The city asserts, and the trial court agreed, that plaintiffs' complaint fails to state a cause of action for declaratory relief under the CUA and the MMPA because federal law preempts those enactments. Noting that the Controlled Substances Act (CSA) continues to prohibit the possession of marijuana even for medical uses (see 21 U.S.C. §§ 812, 844(a); *Gonzales v. Raich* (2005) 545 U.S. 1, 26–29 [162 L.Ed.2d 1, 125 S.Ct. 2195] (*Gonzales*); *United*

---

[6] Accordingly, we must deny as moot in this appeal plaintiffs' request for judicial notice concerning the legislative history of the MMPA.

*States v. Oakland Cannabis Buyers' Cooperative* (2001) 532 U.S. 483, 491–495 [149 L.Ed.2d 722, 121 S.Ct. 1711] (*Oakland Cannabis*)), the trial court viewed the CUA and the MMPA as an attempted "state[] override of federal law to make the drug marijuana legal, or . . . to make legal the sale of marijuana through medical marijuana dispensaries."

In *Gonzales*, the high court held intrastate growth and use of medical marijuana under the CUA did not place the defendants there beyond the CSA's reach, since Congress's plenary commerce power extends to these activities. (*Gonzales, supra,* 545 U.S. at pp. 17, 26–29.) And in *Oakland Cannibis*, the court held the CSA did not authorize an implied defense to its penal provisions based on medical necessity, even where a state strictly controlled access to medical marijuana. (*Oakland Cannibis, supra,* 532 U.S. at p. 491.) To the contrary, the terms of the CSA reflect Congress's conclusion that marijuana serves no medical purpose. (*Oakland Cannibis,* at p. 491.) Relying on *Gonzales* and *Oakland Cannibis* and reasoning that states do not have authority to override federal law, the trial court found that federal law preempted the CUA and the MMPA. Accordingly, the trial court sustained without leave to amend the city's demurrer to plaintiffs' first cause of action for a declaratory judgment that state law preempted the city's ordinance.

Whether federal law preempts state law is a legal issue that we review de novo. (*Spielholz v. Superior Court* (2001) 86 Cal.App.4th 1366, 1371 [104 Cal.Rptr.2d 197] (*Spielholz*).) As we explain below, California's decision in the CUA and the MMPA to decriminalize *for purposes of state law* certain conduct related to medical marijuana does nothing to "override" or attempt to override federal law, which remains in force. (See, e.g., *Gonzales* and *Oakland Cannibis*.) To the contrary, because the CUA and the MMPA do not mandate conduct that federal law prohibits, nor pose an obstacle to federal enforcement of federal law, the enactments' decriminalization provisions are not preempted by federal law.

 Congress has the power to preempt state law under the Constitution's supremacy clause. (U.S. Const., art. VI, cl. 2; see, e.g., *Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372–374 [147 L.Ed.2d 352, 120 S.Ct. 2288] (*Crosby*); *Gibbons v. Ogden* (1824) 22 U.S. 1, 211 [6 L.Ed. 23]; *McCulloch v. Maryland* (1819) 17 U.S. 316, 427 [4 L.Ed. 579].) "[T]here is," however, "a strong presumption against federal preemption when it comes to the exercise of historic police powers of the states. [Citations.] That presumption will not be overcome absent a clear and manifest congressional purpose." (*People v. Boultinghouse* (2005) 134 Cal.App.4th 619, 625 [36 Cal.Rptr.3d 244] (*Boultinghouse*).) Because regulation of medical practices and state criminal sanctions for drug possession are historically matters of state police power, we must take a narrow view of any asserted federal

preemption in these areas. (*County of San Diego, supra,* 165 Cal.App.4th at pp. 822–823.)

▮ Our Supreme Court has identified "four species of federal preemption: express, conflict, obstacle, and field. [Citation.] [¶] First, express preemption arises when Congress 'define[s] explicitly the extent to which its enactments pre-empt state law. [Citation.] Pre-emption fundamentally is a question of congressional intent, [citation], and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.' [Citations.] Second, conflict preemption will be found when simultaneous compliance with both state and federal directives is impossible. [Citations.] Third, obstacle preemption arises when ' "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citations.] Finally, field preemption, i.e., 'Congress' intent to pre-empt all state law in a particular area,' applies 'where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.' [Citation.]" (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935–936 [63 Cal.Rptr.3d 50, 162 P.3d 569], fn. omitted (*Viva!*).)

The first and the last of the foregoing categories do not apply here, given language in the CSA "demonstrat[ing] Congress intended to reject express and field preemption of state laws concerning controlled substances." (*County of San Diego, supra,* 165 Cal.App.4th at p. 819.) Specifically, section 903 of title 21 of the United States Code provides: "No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, *unless there is a positive conflict* between that provision of this subchapter and that State law *so that the two cannot consistently stand together.*" (Italics added.) With this language, Congress declined to assert express preemption in the area of controlled substances and directly foreswore field preemption (*County of San Diego,* at p. 819), leaving only conflict preemption and obstacle preemption as potential bases supporting the trial court's preemption ruling.

### 1. *Conflict Preemption*

Conflict preemption exists when "simultaneous compliance with both state and federal directives is impossible." (*Viva!, supra,* 41 Cal.4th at p. 936.) The city does not explain how any of the state law decriminalization provisions of the CUA or the MMPA create a positive conflict with federal law, so that it is

impossible to comply with both federal and state laws. A claim of positive conflict might gain more traction if the state *required*, instead of merely exempting from state criminal prosecution, individuals to possess, cultivate, transport, possess for sale, or sell medical marijuana in a manner that violated federal law. But because neither the CUA or the MMPA require such conduct, there is no "positive conflict" with federal law, as contemplated for preemption under the CSA. (21 U.S.C. § 903.) In short, nothing in either state enactment purports to make it impossible to comply simultaneously with both federal and state law.

As we explained in *City of Garden Grove v. Superior Court* (2007) 157 Cal.App.4th 355, 385 [68 Cal.Rptr.3d 656] (*Garden Grove*), "no conflict" arises "based on the fact that Congress has chosen to prohibit the possession of medical marijuana, while California has chosen not to." Simply put, "California's statutory framework has no impact on the legality of medical marijuana under federal law . . . ." (*Ibid.*; accord, *Hyland v. Fukuda* (9th Cir. 1978) 580 F.2d 977, 981 [state law allowing felons to carry guns not preempted by contrary federal law since "there is no conflict between" the two].) As we observed in *Garden Grove*, the high court's decision in *Gonzales* demonstrated the absence of any conflict preventing coexistence of the federal and state regimes since " '[e]nforcement of the CSA can continue as it did prior to the [CUA].' " (*Garden Grove*, at p. 385.) No positive conflict exists because neither the CUA nor the MMPA requires anything the CSA forbids.

The city asserts, without explanation, that "[t]he requirement that cities, in effect, permit storefront dispensaries to operate within their boundaries positively conflicts with the CSA." It is true that California and the federal government have conflicting views of the potential health benefits of marijuana. But that does not mean the application of state and federal laws are in conflict. If state law in fact preempts the city's ordinance—a question we have noted is not yet ripe in this proceeding, we discern nothing in the city's compliance with state law that would require the violation of federal law. The federal CSA does not direct local governments to exercise their regulatory, licensing, zoning, or other power in any particular way. Consequently, a city's compliance with state law in the exercise of its regulatory, licensing, zoning, or other power with respect to the operation of medical marijuana dispensaries that meet state law requirements would not violate conflicting federal law. And we see no reason to suppose state law preemption of the ordinance would require a city or its employees or agents to operate a medical marijuana dispensary or otherwise engage in conduct prohibited by the CSA. The fact that some individuals or collectives or cooperatives might choose to act in the absence of state criminal law in a way that violates federal law does not implicate the city in any such violation. As we observed in *Garden Grove*, governmental entities do not incur aider and abettor or direct liability

by complying with their obligations under the state medical marijuana laws. (*Garden Grove, supra*, 157 Cal.App.4th at pp. 389–390; accord, *County of San Diego, supra*, 165 Cal.App.4th at p. 825, fn. 13.) Consequently, we conclude the city's positive conflict argument is without merit.

### 2. *Obstacle Preemption*

Obstacle preemption does not support the trial court's preemption determination either. A state enactment becomes a nullity under obstacle preemption when, " ' "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citations.]" (*Viva!, supra*, 41 Cal.4th at p. 936.) If the purpose of the federal act " '*cannot otherwise be accomplished*—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.' " (*Crosby, supra*, 530 U.S. at p. 373, italics added.)

In *County of San Diego*, the court concluded the MMPA's "identification card laws do not pose a significant impediment to specific federal objectives embodied in the CSA" because the CSA's purpose "is to combat recreational drug use, not to regulate a state's medical practices." (*County of San Diego, supra*, 165 Cal.App.4th at pp. 826–827, citing *Gonzales v. Oregon* (2006) 546 U.S. 243, 272–273 [163 L.Ed.2d 748, 126 S.Ct. 904] [construing CSA as a "statute combating recreational drug abuse" rather than as an "expansive" interposition of "federal authority to regulate medicine"].)

Here, the city identifies section 11362.775, enacted by the MMPA, as the specific state statutory obstacle triggering federal preemption. According to the city, this section "poses a significant impediment" to the CSA's purpose of combating recreational drug use because it "is *being abused* by persons and groups to open storefront dispensaries *for profit*." (Italics added.) As noted *ante*, however, the MMPA bars individuals and any collective, cooperative, or other group from transforming medical marijuana projects authorized under the MMPA into profiteering enterprises. (§ 11362.765, subd. (a) ["nothing in this section shall authorize . . . any individual or group to cultivate or distribute marijuana for profit"].)

The city further explains "[t]he 'obstacle' to federal goals presented by Section 11362.775 is the creation of the exemption for collectives," which is "being abused" "by allowing the diversion of 'medical' marijuana to those not qualified to use it." But the city's complaint is thus *not* that state law amounts to an obstacle to federal law, but that "abuse[]" or violation of state law does. These circumstances call for enforcement of the state law, not its

abrogation. Upholding the law respects the state's authority to legislate in matters historically committed to its purview. (*Boultinghouse, supra,* 134 Cal.App.4th at p. 625.)

 In any event, obstacle preemption only applies if the state enactment undermines or conflicts with federal law to such an extent that its purposes " 'cannot otherwise be accomplished . . . .' " (*Crosby, supra,* 530 U.S. at pp. 373–374 [holding Mass. law restricting purchase of goods or services from companies doing business in Burma conflicted with federal legislation delegating control of economic sanctions to the President].) Preemption theory, however, is not a license to commandeer state or local resources to achieve federal objectives. As Judge Kozinski has explained: "That patients may be more likely to violate federal law if the additional deterrent of state liability is removed may worry the federal government, but the proper response—according to *New York* and *Printz*—is to ratchet up the federal regulatory regime, *not* to commandeer that of the state." (*Conant v. Walters* (9th Cir. 2002) 309 F.3d 629, 646 (conc. opn. of Kozinski, J.), original italics.)

On the facts presented in *County of San Diego,* the court noted "the unstated predicate" of the obstacle preemption argument was "that the federal government is entitled to conscript a state's law enforcement officers into enforcing federal enactments, over the objection of that state, and this entitlement will be obstructed to the extent the identification card precludes California's law enforcement officers from arresting medical marijuana users." (*County of San Diego, supra,* 165 Cal.App.4th at p. 827.) The court rejected the argument, as follows: "The argument falters on its own predicate because Congress does not have the authority to compel the states to direct their law enforcement personnel to enforce federal laws. In *Printz v. United States* (1997) 521 U.S. 898 [138 L.Ed.2d 914, 117 S.Ct. 2365], the federal Brady Act purported to compel local law enforcement officials to conduct background checks on prospective handgun purchasers. The United States Supreme Court held the 10th Amendment to the United States Constitution deprived Congress of the authority to enact that legislation, concluding that 'in [*New York v. United States* (1992) 505 U.S. 144 [120 L.Ed.2d 120, 112 S.Ct. 2408] we ruled] that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.' [Citation.]" (*County of San Diego,* at pp. 827–828.)

Just as the federal government may not commandeer state officials for federal purposes, a city may not stand in for the federal government and rely

on purported federal preemption to implement federal legislative policy that differs from corresponding, express state legislation concerning medical marijuana. *Tilehkooh, supra,* 113 Cal.App.4th 1433 is instructive. There, the court held the CUA "provides a defense to a probation revocation based on marijuana possession or use." (113 Cal.App.4th at p. 1445.) The People argued the defendant could not raise the CUA as a defense to revocation of his probation based on marijuana possession, citing the probation condition that the defendant obey not only the laws of California, but also the laws of the United States. The court, however, was not persuaded. It explained, "The People have misunderstood the role that the federal law plays in the state system. The California courts long ago recognized that state courts do not enforce the federal criminal statutes. 'The State tribunals have no power to punish crimes against the laws of the United States, *as such.* The same act may, in some instances, be an offense against the laws of both, and it is only as an offense against the State laws that it can be punished by the State, in any event.' [Citations.]" (113 Cal.App.4th at pp. 1445–1446, fn. omitted.)

Continuing, the *Tilehkooh* court reasoned, "Since the state does not punish a violation of the federal law 'as such,' it can only reach conduct subject to the federal criminal law by incorporating the conduct into the state law.[7] The People do not claim they are enforcing a federal criminal sanction attached to the federal marijuana law. Rather, they seek to enforce the state sanction of probation revocation which is solely a creature of state law. [Citation.]" (*Tilehkooh, supra,* 113 Cal.App.4th at p. 1446.) But as *Tilehkooh* explained, "The state cannot do indirectly what it cannot do directly. That is what it seeks to do in revoking probation when it cannot punish the defendant under the criminal law. [¶] . . . [¶] California courts do not enforce the federal marijuana possession laws when defendants prosecuted for marijuana possession have a qualified immunity under [the CUA]. Similarly, California courts should not enforce federal marijuana law for probationers who qualify for the immunity provided by [the CUA]." (*Id.* at pp. 1446–1447.)

██ These principles apply a fortiori to a city—a creature of the state. As we explained in *Garden Grove,* the city there could not "invoke and rely solely on federal law to justify a particular sanction (i.e., the destruction of Kha's [medical marijuana]) when Kha's conduct was consistent with, and indeed sanctioned under, state law." (*Garden Grove, supra,* 157 Cal.App.4th at p. 380.) "Applying the reason[ing] of *Tilehkooh,*" we concluded that "judicial enforcement of federal drug policy is precluded in this case because the act in question—possession of medical marijuana—does not constitute an offense against the laws of both the state and the federal governments." (*Ibid.*)

---

[7] We note such incorporation is still subject to analysis under the Constitution's supremacy clause.

Quoting *Tilehkooh*, we explained that "[b]ecause the act is strictly a federal offense," the city had " ' "no power to punish [it] *as such*." ' " (*Garden Grove*, at p. 380, original italics.)

The same is true here. The city may not justify its ordinance solely under federal law (*Garden Grove, supra*, 157 Cal.App.4th at p. 380; *Tilehkooh, supra*, 113 Cal.App.4th at pp. 1445–1446), nor in doing so invoke federal preemption of state law that may invalidate the city's ordinance.[8] The city's obstacle preemption argument therefore fails.

■■■ Thus, the trial court erred when it sustained the city's demurrer on the basis of federal preemption. A petition for a declaratory judgment is itself a valid cause of action, and not merely a request for relief on other grounds. (Code Civ. Proc., § 1060.) Because the city has identified no defect on the face of plaintiffs' complaint concerning their cause of action for declaratory judgment that the city's ordinance is preempted by state law, the city's demurrer fails and we therefore reverse and remand for proceedings consistent with this opinion.

E. *The Trial Court Properly Sustained the City's Demurrer to Plaintiffs' Unruh Civil Rights Act Claim*

Plaintiffs contend the trial court erred by sustaining the city's demurrer to their second cause of action, in which they claimed the city's ordinance severely restricting or banning medical marijuana dispensaries, under threat of criminal prosecution, violated civil rights protected by the Unruh Civil Rights Act. (See Civ. Code, § 51, subd. (b); see generally 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 898(2), p. 376.) The act's purpose "is to compel recognition of the equality of all persons in the right to the particular service offered by an organization or entity covered by the act." (*Curran v. Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712, 733 [195 Cal.Rptr. 325].) "Emanating from and modeled upon traditional 'public accommodations' legislation, the Unruh Act expanded the reach of such statutes from common carriers and places of public accommodation and recreation, e.g., railroads, hotels, restaurants, theaters and the like, to

---

[8] In *People v. Moret* (2009) 180 Cal.App.4th 839 [104 Cal.Rptr.3d 1], a concurring justice distinguished *Tilehkooh* based on the Legislature's subsequent enactment of section 11362.795, amending the MMPA. Section 11362.795, by specifying a defendant may seek confirmation from the trial court that he or she is allowed to use medical marijuana on probation, suggests the trial court may impose a no-use probation condition, despite the CUA and MMPA and independent of federal law. (*Moret*, at pp. 853–857.) This conclusion, however, does not undermine the rationale of *Tilehkooh*, but instead demonstrates that section 11362.795 operates as a matter of state law and not federal preemption. Section 11362.795 has no bearing on the city's reliance on federal preemption to obtain demurrer.

include 'all business establishments of every kind whatsoever.' " (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 731 [180 Cal.Rptr. 496, 640 P.2d 115].)

Specifically, the act's operative provision, Civil Code section 51, subdivision (b), provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

■ Our task in examining any enactment "is to ascertain and effectuate legislative intent. [Citations.] We turn first to the words of the statute themselves, recognizing that 'they generally provide the most reliable indicator of legislative intent.' [Citations.] When the language of a statute is 'clear and unambiguous' and thus not reasonably susceptible of more than one meaning, ' " ' "there is no need for construction, and courts should not indulge in it." ' " ' ' [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].)

■ The trial court correctly concluded the Unruh Civil Rights Act does not apply to the city's enactment of legislation. In *Burnett v. San Francisco Police Department* (1995) 36 Cal.App.4th 1177 [42 Cal.Rptr.2d 879] (*Burnett*), the court observed: "By its plain language, the Act bars discrimination based on 'sex, race, color, religion, ancestry, national origin, or disability' by '*business establishments.*' [Citation.] Nothing in the Act precludes *legislative bodies* from enacting ordinances which make age distinctions among adults." (*Id.* at pp. 1191–1192, original italics.) Because a city enacting legislation is not functioning as a "business establishment[]," we conclude the act does not embrace plaintiffs' claims against the city for discrimination based on a disability or medical condition calling for the use of medical marijuana.

■ A federal district court, in *Gibson v. County of Riverside* (C.D.Cal. 2002) 181 F.Supp.2d 1057, 1093 (*Gibson*), has disagreed with *Burnett* on grounds that the Unruh Civil Rights Act forbids discrimination " 'in all business establishments' " and not just *by* " 'business establishments.' " We are not persuaded. First, the decisions of the lower federal courts are not binding precedent (*Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1715 [1 Cal.Rptr.3d 328]), particularly on issues of state law. Second, while it is true that legislation may not immunize a business from Unruh Civil Rights Act claims for discrimination that occurs in that establishment (see *Gibson*, at p. 1093, relying on *Orloff v. Los Angeles Turf Club* (1951) 36 Cal.2d 734, 737 [227 P.2d 449]), it does not

follow that enacting legislation, as here, transforms the governmental entity into a "business establishment[]" that is subject to a lawsuit under the express terms of the act.

Because the terms of the Unruh Civil Rights Act expressly apply to "business establishments," we see no room for its application to the city's legislative action here. Accordingly, we agree with *Burnett* and disagree with *Gibson.* The act does not apply to the city in the circumstances here, and the trial court therefore properly sustained the city's demurrer to plaintiffs' second cause of action.

### III

### DISPOSITION

We affirm the trial court's order concluding plaintiffs failed to state an Unruh Civil Rights Act civil rights cause of action, but reverse the judgment of dismissal and reinstate plaintiffs' cause of action seeking declaratory judgment on whether the CUA or the MMPA preempts the city's ordinance. Each side shall bear its own costs for this appeal.

Rylaarsdam, Acting P. J., and Fybel, J., concurred.

Respondent's petition for review by the Supreme Court was denied December 1, 2010, S186752. Baxter, J., was of the opinion that the petition should be granted.