Filed 9/26/13  P. v. Peddell CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>WILLIAM PEDDELL,<br><br>　　　　Defendant and Appellant. | B241498<br><br>(Los Angeles County<br>Super. Ct. No. NA089584) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed.

Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \*

Defendant William Peddell appeals from the judgment entered following a jury trial that resulted in his conviction of cultivating marijuana (Health & Saf. Code, § 11358; count 1) and making a criminal threat (Pen. Code, § 422; count 2).[1] He was sentenced to prison for two years eight months, consisting of the two-year midterm on count 1 and one-third the midterm, or eight months, on count 2.

Defendant contends the trial court violated his constitutional rights to due process and to present a medical marijuana defense by excluding the physician letters recommending marijuana use and marijuana cards for himself, his mother and an acquaintance, Thomas Raasch. He contends his criminal threat conviction is unsupported by the evidence. He also contends his right to due process was violated because the trial court failed to order a postconviction probation report prior to imposing his sentence.

We affirm the judgment. Defendant forfeited any claim of error regarding exclusion of the offered medical marijuana letter as to himself and the marijuana ID card in the name of Mr. Raasch, because he did not seek to have such documents admitted into evidence. The trial court did not abuse its discretion in excluding the offered medical marijuana letters as to his mother and Mr. Raasch and Mr. Raasch's marijuana ID card, because they were irrelevant and any probative value was outweighed by their potential prejudice. Substantial evidence supports defendant's criminal threat conviction. The absence of a postconviction probation report is nonprejudicial and therefore inconsequential.

## BACKGROUND

### 1. The Criminal Threat Conviction (Count 2)

Defendant leased a suite at a business park in Signal Hill managed by PS Business Parks (company). On July 7, 2011, Mark Antrobius, the company's senior director of leasing, went to that location in response to a call that someone was towing cars off the property and in so doing was hitting other cars in the park. Upon his arrival, he saw

---

[1] Allegations defendant had suffered a prior serious felony conviction (Pen. Code § 667, subd. (a)) which qualified as a strike under the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) were stricken for lack of evidence.

2

defendant, who was sweating profusely and appeared "scruffy," standing next to two police officers. Defendant told him about a dispute over parking spaces and his intent to park some car trailers in front of his suite. Their "face-to-face" conversation, which lasted about 10 minutes, escalated into an argument. Mr. Antrobius told defendant that trailers were not permitted, but defendant insisted he would park his there.

On July 8, 2011, about 9:30 a.m., at the company's office, Cynthia Vargas (also known as Cynthia Pearce), an administrative assistant, answered a telephone call from someone who identified himself as Peddell and asked to speak with Mr. Antrobius. When told he was unavailable, the caller demanded Mr. Antrobius call him "now" and abruptly hung up. Ms. Vargas wrote down the caller's name and number and gave the note to Mr. Antrobius in his office.

Mr. Antrobius recognized defendant's voice when a call was transferred to his office less than 30 seconds later. The call, which lasted about five to ten minutes, was on a speaker phone in the presence of Ms. Vargas and Deborah Burritt, another administrative assistant.

When defendant asked if Mr. Antrobius was the person he had spoken to yesterday at the property, Mr. Antrobius replied yes. After defendant told him to hold his "f---ing tongue," Mr. Antrobius just listened as defendant yelled and spoke using profanity. He stated he needed to get back his tow truck which had been towed from the business park. He stated Mr. Antrobius and other company employees were "Gestapos"; "[y]ou guys own basically Signal Hill"; "[y]ou can tell the Signal Hill police force what to do"; and he would make their lives a living hell. Just before hanging up, defendant warned him: "If you don't give me back my f---ing . . . tow truck, I'm going to kill you." This death threat made Mr. Antrobius afraid of defendant. Ms. Vargas and Ms. Burritt also heard the threat.

Mr. Antrobius was in "awe" and "discombobulated." Shortly thereafter, Mr. Antrobius called his boss. He also called the police because of defendant's death threat and his belief in defendant's ability to carry out the threat. Mr. Antrobius was still fearful when police arrived 20 to 30 minutes later, because no one had threatened him

3

before and he believed defendant could harm him or his coworkers in view of the "very close" proximity of the park to the office. The company responded by hiring an armed guard for the office and an unarmed guard for the business park.

The fear Mr. Antrobius felt was heightened by what he had heard before July 7, 2011, about a previous incident involving defendant and Sandra Witcher, a coworker. About March 2011, defendant acted aggressively towards Ms. Witcher, screaming and yelling about recently posted car tow-away signs in the park. After police were called, he moved away from her but later made an obscene gesture at her from a rooftop.

At trial, defendant denied threatening or giving "the finger" to Ms. Witcher and testified it was Ms. Witcher who had threatened him. He testified that on July 7, 2011, he asked Mr. Antrobius for his business card but otherwise did not speak to him. He also denied speaking with him over the phone on July 8, 2011. He testified it was Mr. Raasch, a passenger in defendant's vehicle, who called Mr. Antrobius on defendant's cell phone, because defendant was driving. During that call, he heard Mr. Raasch raise his voice in frustration but did not hear him say he was going to kill anyone.

Mr. Raasch testified that towards the end of June 2011, while a passenger in defendant's car, he heard defendant, who was talking on his cell phone while driving, talk with someone about his towed vehicle. During the two- to three-minute conversation, Mr. Raasch never heard defendant threaten to kill anyone. Grabbing the phone, Mr. Raasch asked the unidentified male on the other end for the location of defendant's towed vehicle. During the conversation, which only lasted about a minute, Mr. Raasch said: "Give him the truck back. You are killing him." Mr. Raasch denied he ever threatened to kill anyone during this conversation.

## 2. Marijuana Cultivation Conviction (Count 1)

On July 9, 2011, about 7:30 a.m., the Signal Hill police executed a search warrant for "Unit J," the warehouse suite defendant leased at the business park. In the blocked off area of the upstairs loft, the police recovered various items commonly used to grow marijuana, including a device to clone marijuana plants, and 161 marijuana plants. On the ground floor of the unit, police found a file folder containing a copy of defendant's

4

driver's license and various advertisements printed from craigslist online, including an ad for how to sell marijuana and make $50,000 doing so tax free.

Detective Nicholas Davenport, the People's expert, opined only defendant was involved in the growing of marijuana in Unit J. He did not find any evidence the seized marijuana plants were part of a "collective," i.e., a group of individuals who collectively cultivated marijuana and had a doctor's recommendation of marijuana use. He opined the 161 seized marijuana plants were not cultivated for the use of a single person or even three people, because the marijuana produced was far in excess of what three persons would use. His opinion was also supported by the facts the plants were grown indoors and concealed upstairs. Detective Davenport opined the seized marijuana would yield at least 20 pounds of usable marijuana, which would sell at a dispensary for $2,000 to $3,000 per pound. This marijuana had a value at wholesale between $40,000 and $140,000, which value would increase if the marijuana were sold on the street or in another area.

At trial, defendant relied on a compassionate use defense. In pertinent part, the jury was instructed: "The cultivation of marijuana is not unlawful when the acts of a qualified patient or a primary caregiver are authorized by law for compassionate use. The cultivation of marijuana is lawful (1) where its medical use is deemed appropriate and has been recommended or approved, orally or in writing, by a physician; (2) the physician has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief; (3) the marijuana cultivated was for the personal medical use of the patient; and (4) the quantity of marijuana cultivated was reasonably related to the patient's then current medical needs." (CALJIC No. 12.24.1.)

Defendant presented evidence he intended to grow a six-month supply of medical marijuana for his own use and to provide any excess to his mother and Mr. Raasch, both of whom had medical marijuana recommendations. He identified the defense exhibit marked "M" as his medical marijuana ID Card. He testified he used about one pound of

5

marijuana each month to relieve chronic neck and back pain, and used seeds to grow the marijuana.

His mother identified the defense exhibit marked "L" as her medical marijuana letter.  She testified she purchased her marijuana from a dispensary and grew her own but denied getting any from defendant.  She had given him $4,000 to $5,000 for marijuana growing supplies and about 200 marijuana seeds.

Mr. Raasch testified he purchased his marijuana from a dispensary.  He identified the defense exhibit marked "K" as the medical marijuana letter he gave to defendant, because defendant had a marijuana cooperative and Mr. Raasch wanted to be in "the co-op."  He testified he was in the co-op but admitted he did nothing for the co-op and defendant never supplied him with marijuana.

## DISCUSSION

### 1. Evidentiary Claims of Error Forfeited and Exclusion of Evidence Nonprejudicial

Defendant contends the trial court violated his constitutional rights to due process and to present a defense by excluding a medical marijuana letter in his name (People's exh. 20), another in the name of his mother (Defense exh. L), and a third in the name of Mr. Raasch (Defense exh. K) and the marijuana ID card in Mr. Raasch's name (People's exh. 19).  We disagree.

### a. Medical marijuana defenses to unlawful cultivation of marijuana

Health and Safety Code sections 11357 and 11358,[2] respectively, describe the offenses of unauthorized possession of marijuana and the unauthorized cultivation, harvesting, or processing of marijuana.  California voters approved Proposition 215 in November 1996, which codified the Compassionate Use Act of 1996 (CUA).  (§ 11362.5, subd. (a).)  In pertinent part, the CUA provides:  "Section 11357, relating to the

---

[2]    All further section references are to the Health and Safety Code unless otherwise indicated.

possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."  (§ 11362.5, subd. (d).)

The Legislature later enacted the Medical Marijuana Program Act (MMPA), effective January 1, 2004, which set up a voluntary medical marijuana ID card program. (Stats. 2003, ch. 875, § 2.)  "According to the act's legislative history, '*Nothing in* [*the MMPA*] *shall amend or change Proposition 215, nor prevent patients from providing a defense under Proposition 215. . . . The limits set forth in* [*the MMPA*] *only* serve to provide immunity from arrest for patients taking part in the voluntary ID card program, *they do not change* [*s*]*ection 11362.5* (Proposition 215) . . . .' [Citation.]"  (*Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 744.)

In pertinent part, the MMPA excluded from criminal liability for marijuana possession (§ 11357) and cultivation (§ 11358) "[a] qualified patient or a person with an identification card who transports or possesses marijuana for his or her own personal medical use" and "[a] designated primary caregiver who transports, processes, administers, delivers, or gives away marijuana for medical purposes, in amounts not exceeding those established in subdivision (a) of Section 11362.77, only to the qualified patient of the primary caregiver, or to the person with an identification card who has designated the individual as a primary caregiver."  (§ 11362.765, subds. (a), (b)(1)-(2).)

The MMPA established a defense to criminal sanctions for certain individuals who are associates in a medical marijuana cultivation collective or cooperative:  "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section[s] 11357, 11358, [etc.]"  (§ 11362.775.)  This defense only applies to nonprofit collectives or cooperatives.  (*People v. Jackson* (2012) 210 Cal.App.4th 525,

538-539; see also § 11362.765, subd. (a) ["nothing in this section shall . . . authorize any individual or group to cultivate . . . marijuana for profit"].)

### b. Exclusion of exhibits 19 and 20 claims of error forfeited

Defendant contends the trial court erred in excluding exhibit 19 (the marijuana card in Mr. Raasch's name) and exhibit 20 (defendant's medical marijuana letter).  He has forfeited his right to review of these claims of error.

A defendant may forfeit his claim of constitutional error by failing to assert it below, and our Supreme Court has "long held that the proponent of evidence must identify the specific ground of admissibility at trial or forfeit that basis of admissibility on appeal."  (*People v. Ervine* (2009) 47 Cal.4th 745, 783.)  The record reveals that, over the prosecutor's objection, the court admitted the marijuana ID card in defendant's name (exh. M), finding it to be relevant in determining whether defendant was a "qualified patient" under the CUA.  Defendant, however, never sought admission of exhibits 19 and 20.

The prosecutor marked a marijuana ID card in Mr. Raasch's name as People's exhibit 19 and a document which appeared to be a medical marijuana letter issued to defendant as People's exhibit 20.  A medical marijuana letter in the name of defendant's mother was marked as People's exhibit 21 and later marked as Defense exhibit L (exh. L).  The prosecutor subsequently requested admission of all exhibits offered by the People, *except* exhibits 19, 20 and 21, which request the court granted.  Defendant's counsel did not request the trial court admit exhibit 19 or exhibit 20 at that time, nor did he seek admission of these two exhibits during the defense case.  Defendant therefore forfeited his claims of error as to exclusion of exhibits 19 and 20.

### c. No abuse of discretion in exclusion of exhibits K and L

Defendant contends the trial court erred in excluding, as hearsay, the medical marijuana letter in Mr. Raasch's name (exh. K) and the one in his mother's name

8

(exh. L), because these documents were admissible under the operative fact doctrine.[3] His basic premise is incorrect. The court in fact excluded these two documents under Evidence Code section 352 after finding their probable prejudicial impact outweighed any probative value of these documents.

The court did not abuse its discretion in excluding under Evidence Code section 352 the medical marijuana letters in the names of Mr. Raasch and defendant's mother. "As a general proposition, the ordinary rules of evidence do not infringe on a defendant's right to present a defense. [Citation.] Trial courts possess the 'traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' [Citation.] The trial court's rulings in this regard will not be overturned on appeal unless it can be shown that the trial court abused its discretion." (*People v. Frye* (1998) 18 Cal.4th 894, 945, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The trial court is imbued with wide discretion in excluding relevant evidence if the evidence's "probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352; see also *People v. Richardson* (2008) 43 Cal.4th 959, 1000-1001.) Such discretion "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

To counter defendant's compassionate use defense, the prosecution sought to prove even if defendant were authorized to cultivate marijuana for his own medical needs, the amount of marijuana seized showed his cultivation exceeded the amount needed for his own use. Defendant offered the medical marijuana letters in the names of

---

[3]    Hearsay is an out-of-court statement "offered to prove the truth of the matter stated." (Evid. Code, § 1200.) Under the so-called operative fact doctrine, " '[i]f a fact in controversy is whether certain words were spoken or written and not whether the words were true, evidence that these words were spoken or written is admissible as nonhearsay evidence.' [Citation.] Often, such evidence is referred to as ' "operative facts." ' [Citations.]" (*People v. Fields* (1998) 61 Cal.App.4th 1063, 1068-1069.)

9

defendant's mother and Mr. Raasch to show such excess cultivation was legal, because his marijuana cultivation also was on behalf of a nonprofit collective or cooperative, which was authorized by law.

Evidence that his mother and Mr. Raasch were authorized to obtain medical marijuana from defendant was relevant only if defendant cultivated the marijuana for a nonprofit collective or cooperative and both defendant's mother and Mr. Raasch obtained their marijuana from the collective.[4] Insufficient evidence was presented to establish such prerequisites were met. Defendant in fact characterized his cultivation of marijuana as a "business venture."

Moreover, his mother testified defendant did not supply her with marijuana. Also, although she gave him $4,000 to $5,000 as start-up costs related to marijuana cultivation, she grew her own and did not testify she was part of any cooperative. Mr. Raasch testified he gave defendant his medical marijuana letter (exh. K), because defendant had a cooperative and Mr. Raasch wanted to be in "the co-op." He testified that he was in the co-op yet he admitted, however, he did nothing for the co-op, and defendant never supplied him with marijuana.

The medical marijuana letters (exhs. K & L) therefore were irrelevant to defendant's compassionate use defense and if they had been admitted, would have only caused jury confusion. The trial court did not abuse its discretion in excluding the medical marijuana letters under Evidence Code section 352 on the ground their potential prejudicial effect outweighed any probative value such evidence might have. At best, the probative value of such evidence was de minimis. In contrast, admission of such evidence presented grave dangers the jury would become confused regarding the issues to be decided and might be misled as to how to evaluate this evidence in the context of such issues.

---

[4]     Before trial, defendant's attorney indicated his intent to rely on a primary caregiver defense. At trial, this defense apparently was abandoned, because no evidence was presented defendant qualified as a "primary caregiver" (§ 11362.5, subd. (d).) In this regard, the medical marijuana letters therefore were irrelevant.

10

### 2. Criminal Threat Conviction Supported by Substantial Evidence

Defendant contends his criminal threat conviction (count 1) is not supported by sufficient evidence, because his threat to kill Mr. Antrobius, which was not unequivocal, unconditional, and immediate, did not convey the requisite gravity of purpose and an immediate prospect of execution. We find substantial evidence supports the conviction.

The crime of criminal threat (Pen. Code, § 422) consists of "five constituent elements that must be established to find that a defendant has committed this offense. In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

A challenge to the sufficiency of the evidence is reviewed for substantial evidence in support of the judgment. "Under that standard, ' "an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt." ' [Citations.] ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' [Citation.]" (*In re George T.* (2004) 33 Cal.4th 620, 630-631.)

11

When viewed in the context of the totality of the circumstances, the jury's finding that defendant's threat was so unequivocal, unconditional, immediate, and specific as to convey to the victim a gravity of purpose and an immediate prospect of execution of the threat is supported by substantial evidence. (*People v. Smith* (2009) 178 Cal.App.4th 475, 478-480.) Defendant's threat caused Mr. Antrobius to fear him and rendered Mr. Antrobius in "awe" and "discombobulated." The threat was uttered in the context of defendant's resumption of the argument the two had engaged in the previous day. Defendant's confrontational behavior towards Mr. Antrobius during that earlier face-to-face encounter served to fuel the fear he felt from this death threat. That his fear was sustained and credible is reflected by his unabated state of fear when the police arrived at the office about a half an hour later; the closeness of the office to the business park; the hiring of an armed guard for the office and an unarmed one for the park; and Mr. Antrobius's awareness of previous belligerent behavior by defendant towards a coworker at the park.

### 3.	Absence of Postconviction Probation Report Nonprejudicial

Defendant contends the matter must be remanded to the trial court for further proceedings, because the court erred in failing to order a postconviction probation report, the absence of which violated his constitutional right to due process. The absence of a postconviction probation report is nonprejudicial in this instance.

The record contains a preconviction probation report dated September 16, 2011, which set forth the circumstances surrounding the charged crimes. No statement from defendant was in the report, but a summary of his prior criminal history and record was included. The recommendation was for probation on certain terms and conditions, including substantial jail time.

On May 3, 2012, at sentencing, the court announced it had "read the probation officer's report dated September 16, 2011" and asked whether there was "[a]ny legal cause why . . . defendant cannot be sentenced at this time?" Defendant's attorney responded no.

12

The prosecution recommended a total term of three years eight months, consisting of the three-year upper term on count 2 and one-third the midterm on count 1. When asked for a recommendation, defendant's attorney advised the court he would recommend "probation, but at the very most, [a] low term" of "16 months would be sufficient." In mitigation, he argued defendant had "a rather minor record," in response to which the court responded by noting defendant had 13 misdemeanor convictions. Defense counsel added "a lot of those are traffic"; there were "no crimes of violence, except for going way, way back to 1973, where he was just barely an adult at the time"; defendant was "getting up there in age"; and "[h]e has medical issues."

The court sentenced defendant to two years eight months, i.e., the two-year midterm on count 1 and eight months, or one-third the midterm on count 2.

"[I]f a person is convicted of a felony and is eligible for probation, before judgment is pronounced, the court shall immediately refer the matter to a probation officer to investigate and report to the court, at a specified time, upon the circumstances surrounding the crime and the prior history and record of the person, which may be considered either in aggravation or mitigation of the punishment." (Pen. Code, § 1203, subd. (b)(1).) Waiver of the right to such a probation report must be pursuant to an oral or written stipulation. (*People v. Dobbins* (2005) 127 Cal.App.4th 176, 182.)

Defendant was entitled to a postconviction probation report, and he did not waive that right. Nonetheless, the error in proceeding without the postconviction report was not prejudicial, and thus, of no import to the sentence the trial court imposed. The preconviction probation report alerted the trial court to the circumstances surrounding defendant's crimes, his prior criminal history and record, his eligibility for probation, and recommendation for probation on suggested terms and conditions. Although the record did not include a statement from defendant himself, defendant was present during sentencing represented by counsel and did not choose to speak on his own behalf. His counsel argued the mitigating factors and the absence of aggravating factors. Accordingly, defendant was afforded his constitutional right to due process, and the absence of a postconviction probation report is inconsequential.

13

## DISPOSITION

The judgment is affirmed.

GRIMES, J.

We concur:

BIGELOW, P. J.

FLIER, J.